ALBANY,
February, 1809.

Jackson
v.
Ingraham.

* S. C. 2 *Johns.
Rep.* 230.

---

JACKSON, *ex dem.* WINTHROP, *against* INGRAHAM.

THIS was an action of ejectment for lands, in *Chazy,* in the county of *Clinton.* A verdict was taken for the plaintiff, subject to the opinion of the court, on a case, which the counsel were several hours in reading, but the material facts contained in it, are as follows : At the trial, the plaintiff produced letters patent from the colonial government of the province of *New-York,* to *Elkanah Dean,* dated the 11th *July,* 1769, for a tract of land, lying on the west side of *Lake Champlain,* in the then county of *Albany,* containing 13,500 acres ; and also for an island in the lake, called *Grand Isle,* containing 16,500 acres. Under this patent, which included the premises in question, the lessor of the plain-

This court will not take notice of claims to lands within this state, under grants made by the French government, in *Canada,* prior to the treaty between *Great Britain* and *France,* in 1763. Those claims, being, at most, but equitable, and affording no evidence of a legal title, that can be recognised by a court of law, which

looks only to titles, under patents from this state, or the former colonial government of the province of *New-York.* It appears, that those *Canadian* claims, were pronounced by the colonial assembly, in 1773, to be wholly unfounded.

tiff derived his title. The premises in question, are situated south of the river *St. Lawrence*, and of the 45th degree of north latitude. It was admitted, that the lessor, in 1805, had sold lands within this patent, to several persons, who are in possession under such sales.

The defendant produced a grant from the *French* government in *Canada*, issued by *Charles Marquis de Beauharnois*, and *Giles Hocquart*, at *Quebec*, the 11th *April*, 1733, to *Sieur Megion de la Gauchetiere*, a captain of *marines*, for a tract of land, two leagues in front, and three leagues in depth, along *Lake Champlain*, beginning from the corner of the seignory granted to the *Sieur Pean*, with the title of *Fief* and *Seignory*, with the various rights annexed to such seignories, on condition of paying homage at the castle of St. *Louis*, at *Quebec*, &c. &c. according to the custom of *Paris*, observed in the same province ; and reserving mines, minerals, and land for roads, forts, &c. This grant was ratified, the 8th *February*, 1735.

The defendant also produced the articles of capitulation, between *General Amherst*, commander in chief of the *British* forces in *North America*, and the *Marquis de Vaudreuil*, governor, and lieutenant-general of *Canada*, dated at *Montreal*, the 8th *September*, 1760. By the 37th article of this capitulation, the lords of manors, the military and civil officers, in town and country, are preserved in the entire and peaceable property, and possession of all their goods, estates, and effects, moveable, and immoveable ; and with liberty to keep, sell, or let them to the *French* or *English*, to receive the produce of them in specie, bills of exchange, or otherwise, whenever they shall think proper to go to *France*, paying freight according to the 26th article.

By the fourth article of the treaty of *Paris*, dated the 10th *February*, 1763, *Canada*, and all its dependencies, is renounced by the king of *France*, and ceded in full right to *Great Britain*. *Great Britain* on her part, grants to the inhabitants of *Canada*, the free enjoyment of their religion, and that the subjects of the king of *France*, may retire

with entire freedom and safety, whenever they think proper, and may sell their estates, provided it be to the subjects of the king of *Great Britain*, and may emigrate with their effects, without restraint, except for debts and crimes; and the period of such emigration is limited to 18 months, to be computed from the day of the exchange of the ratification of the treaty.

The plaintiff then produced copies from the minutes of the governor and council of *New-York*, at a court held at *Fort George*, in the city of *New-York*, the 21st *October*, 1768, from which it appeared, that by an order of the king and council, on the 12th *August*, 1768, the king approved, and confirmed the agreement between *Sir Henry Moore*, governor of *New-York*, and the commander in chief of the province of *Canada*, for fixing the division line, between the two provinces, at the 45th degree of north latitude, conformable to the limit laid down by the king's proclamation of *October*, 1763, " provided that nothing therein contained, should extend to affect his majesty's new subjects, having possessions under proper titles, or those tracts of land on the south side of this line, the dominion of which was not disputed, on the part of the crown of *Great Britain;* and provided, also, that the determination shall not operate wholly, to deprive his majesty's new subjects, of such concessions on the south side of the said line, on which they may have made actual settlement, and improvements, although the lands may have been disputed by the crown of *Great Britain;* but, that such possessors shall be entitled to so much of the said concessions, as shall be proportioned to the improvements, at the rate of 50 acres of every 3 acres for improvements, provided they shall take out grants for the same, under the seal of the province of *New-York*, subject to the usual quit-rents; and provided, also, that the grant to no one person shall exceed 20,000 acres."

By order of the governor and council of the province of *New-York*, made the 14th *August*, 1771, it was ordered, that a proclamation issue, notifying to all persons, holding,

ALBANY,
February, 1809.

Jackson
v.
Ingraham.

or laying claim, under titles derived from the government of *France*, while in possession of *Canada*, to any lands upon *Lake Champlain*, northward of *Crown Point*, and to the southward of the 45th degree of north latitude, to transmit to the secretary's office, of the province, within three months, from the date of the order, exemplifications of the original grants, together with satisfactory evidence of the situation of the lands, therein mentioned, and of the solidity of the titles of the claimants thereof, at the time of the surrender of *Canada* to the crown of *Great Britain*, to the end, that the government of the province might be enabled to give the claims, under such *French* grants, the attention they should appear to merit. On the 25th *August*, 1771, the governor of *New-York*, wrote to the commander in chief in *Canada*, inclosing a copy of his proclamation, made pursuant to the order of the council, of the 13th of the same month.

It also appeared from the minutes of the council, that in *December*, 1771, the commander in chief of the province of *Canada*, transmitted to the governor of the province of *New-York*, abstracts taken from the public register, deposited with the secretary of the province of *Canada*, which were closely searched, containing the grantees' names, those of the new proprietors, the dates of the grants, and of their ratifications, those granted *en seigneurie*, and those *en roture*, (in socage,) and copies of the *French* king's edicts and declarations, relative to grants of lands which had the form of law. From these it appeared that the governor and intendant, or in case of their death or absence, those who executed their offices, had the power of granting lands, to be ratified by the king in twelve months, and were the sole judges, in case of a reunion to the royal demesne, where the grantors had not complied with the conditions of their grants, which reunion, however, did not take place until after a hearing upon legal process, issued at the instance of the king's attorney-general. A sentence of reunion of several grants, made on *Lake Champlain*, by governor *Beauharnois*, and the intendant *Hocquart*, dated the

10th *May*, 1741, appeared among the papers, in the regis-ter office, but no complete reunion of grants of lands in that part, subsequent to that period.

On the 6th of *January*, 1772, a committee appointed by the governor and council of the province of *New-York*, and to whom was referred the papers, relative to the *French* claims to lands on *Lake Champlain*, presented their re-port,(*a*) in which they express their opinion, that the go-

ALBANY,
February, 1809.

Jackson
v.
Ingraham.

(*a*) The report of the committee is as follows: " That soon after his majesty was pleased, by his royal proclamation of the 7th *October*, 1763, to declare the 45th degree of northern latitude, to be the boundary between this and the province of *Quebec*, divers tracts of land were granted under the great seal of this province, to the northward of *Crown Point*, on both sides the *Lake Champlain*, and chiefly to the reduced officers and soldiers, claiming his majes-ty's bounty, graciously promised by that proclamation; That Sir *Henry Moore*, and *M. Carlton*, the governors of the two provinces, fixed the place of latitude of 45, by actual observation, near the north end of the lake, in the month of *September*, 1767, and that on the 12th of *August*, 1768, his majesty was pleas-ed to declare his approbation in privy council, and to direct in favour of his new *Canadian* subjects, that nothing in the order of that date contained, should affect the property of such as had possessions, under proper titles of lands, on the south side of the line, the dominion of which, was not disputed on the part of the crown of *Great Britain*; and that the said determina-tion, should not operate wholly, to deprive them of such concessions, on the south side of the said line, wherein they had made actual settlements and im-provements, although the said line might have been disputed by the crown of *Great Britain*; but that they should be entitled to so much of the said conces-sions as should be proportionate to their improvements, at the rate of fifty acres for every three that were improved, with proviso that grants should be sued out, under the seal of *New-York*, subject to the usual quit-rents, and that a grant to one person should not exceed 20,000 acres. The committee have examined the council books, and cannot discover that the government of *Quebec*, ever gave the least intimation to this province, of any *French* grants upon *Lake Champlain*, neither before, nor after the said order, of *August*, 1768, until excited thereunto by your excellency's late proclamation; nor is there any entry to be found of any notification of such claim, by private persons, nor even of any application for any grant, or confirmation, under this government, for lands granted in *Canada*, before the surrender of that coun-try. The committee therefore conceive that it was a natural and reasonable presumption, either that there was no such *French* grants, or that the gran-tees, and their assigns, considered them as invalid, and perhaps forfeited to the *French* crown, before the conquest, or that they declined the acceptance of *British* confirmations, subject to quit-rents, and new patent charges, in-tending to set them up as sufficient, under the articles of capitulation, in the courts of law, upon the supposition, that they were within the ancient domi-nions of the crown of *France*; and agreeably thereto, this government began again to grant lands in that quarter, and continued the practice, until your ex-

vernor might issue patents for the lands, southward of *Crown Point*, and to lands northward of that fort, not within the *French* grants, as not within the 50th article of the

cellency was pleased to communicate to the council his majesty's 50th instruction, prohibiting patents for lands, to the northward of *Crown Point*, claimed under *French* titles ; and if the late grants of this province, are detrimental to these claimants, the committee are of opinion, that the blame falls upon themselves, as it is owing to their neglecting to give the information, naturally to be expected, if they intended to submit to, and take advantage of the royal order of the 12th *August*, 1768. The committee observe, that among the papers now transmitted from *Quebec*, there are no *French* concessions, and ratifications of any of the lands mentioned in the list of those, said to be granted *en roture*, nor for several of these on the list *seigneuries*, besides those specified in Mr. *Cramache's* letter, to your excellency ; nor is there a single petition sent, or preferred by either of those claimants, for a confirmation under this province, of any of their grants, which is the more extraordinary, as your excellency's proclamation, required a full exhibition of their titles, and the crown is greatly interested in the question, concerning the validity of the *French* claims in the articles both of quit-rents, and . escheats, their pretensions extending not only to a vast quantity of land, but to lands the more valuable for their contiguity to the forts and passes, and the navigable waters of the lake ; and from the whole we conjecture, that this conduct is owing to their adopting an opinion, which deserves a serious attention, to wit : That the lands they claim, are situated to the northward of the ancient *British* claim, and that consequently they can maintain a title under the surrender, without the aid of the crown, and free from the usual reservations, restrictions, conditions, and quit-rents. With respect, therefore, to the lands southward of *Crown Point*, and to those to the northward of that fort, not within the limits of the *French* grants, we are of opinion that your excellency may issue patents for them, as lands to which the 50th article of the royal instructions has clearly no relation. Nor do we think, that article ought to be considered to prohibit the grant of those tracts, to which no *French* concessions, or ratifications, appear to be transmitted from *Quebec*, nor any excuse assigned for not laying them before this government, pursuant to the late proclamation, it being very plain from the instruction, that it was intended to restrain only new patents for lands, before claimed by titles derived from the *French* king, and prior to the surrender of *Canada*, and as clear that it was an indispensable duty of all such claimants, in justice to the crown, to give due notice of their claims. But in due deference to his majesty's authority, we advise, as to the lands northward of *Crown Point*, and included by the concessions and ratifications, lately notified to this government, that all petitions for them or any part of them be sent home, together with copies of the *French* grants for his majesty's royal consideration. Several points of inquiry will arise upon those grants, concerning which, the committee choose not to decide, on account of their singular importance and delicacy : 1st. Whether a title, if good under the *French* government, will, by the surrender, be valid by our laws, without the royal confirmation ; or in other words, whether the capitulation gives more to the *French* grantors, than an equitable right to be preferred

royal instructions of the 24th *July*, 1771,(*a*) and that for all lands northward of *Crown Point*, and included by concessions and ratifications, notified to the government of

before others, in the application for a new grant.   2d.  Whether those lands were not forfeited to the crown of *France*, by the conditions in the grants, before the surrender, and so became thereby transferred to his majesty, &c. 3d.  Whether they were not within the ancient *British* claim, and consequently never grantable by the crown of *France*.   And upon this last question, the committee beg leave to remark, that the *British* claim of dominion, before the last war, extended to the southerly bank of the river *St. Lawrence*, and by treaty, to all the country of the six nations in particular, of which the controverted grants are a part; and we find, that so early as the third of *September*, 1696, a patent did pass to *Godfrey Dellius*, under the seal of this province, for lands, including some of those now claimed under the *Canadian* grants, greatly to the northward of *Crown Point*, of which the *French* were not possessed, till near forty years afterwards, to wit, about the year 1731; and whether it is imputable to a consciousness in the *French*, of their want of title, or to any other cause, the committee cannot help observing to your excellency, that, in fact, very few settlements, or improvements, were formed upon any of those *Canadian* grants, except about the *French* forts, at, or since the conclusion of the last peace ; the country near *Lake Champlain*, but for the late settlements under this colony, being, in general, in a wild and uncultivated state ; and as it may be of essential moment to the reduced officers and soldiers, and others who have seated themselves in that district, that his majesty be fully informed of the numerous patents that have passed the seal of this colony, since the acquisition of *Canada*, we recommend it to your excellency, to order the surveyor-general to frame a map, exhibiting the *French* grants and *English* patents, to the northward of *Crown Point*, to be laid before his majesty, with all convenient speed, with a list of the patentees, and an account of the quantity of land contained in their patents, and the quit-rents they are chargeable with ; and for the security and satisfaction of the *French* grantees, we also advise, that, in the interim, the several papers referred to us, be filed in the secretary's office, and a copy of this report, and the order to be made thereon, transmitted to the commander in chief of *Quebec*."

(*a*) This article of the instructions of the king and council is as follows " Whereas sundry persons, proprietors under titles derived from the crown of *France*, when that crown was in possession of *Canada*, of lands on that part of *Lake Champlain* now lying within our province of *New-York*, have humbly represented unto us, that several parcels of the said lands so claimed, have already been granted to other persons by letters patent, under the seal of our said province of *New-York*, and have, therefore, humbly prayed, that a proceeding so prejudicial to their rights, and pretensions, may receive our royal disapprobation : and, whereas, it appears both just and equitable, that the claims of persons, under such titles as aforesaid, should not be affected without the fullest examination thereof : It is therefore, our will and pleasure, and you are thereby directed, and required in no case to make any grants of lands, so claimed as aforesaid upon *Lake Champlain*, to the northward of *Crown Point*, within the province of *New-York*, until the peti-

*New-York*, the petitions, and all papers should be sent home to the king and council, for their consideration.

It appeared also, that by a declaration, or arret of the king of *France*, dated the 19th *October*, 1676, sent to the governor and intendant of *Canada*, that all grants for lands, were to be laid before the king for his confirmation, within one year from their date, and in case of failure, they are declared *ipso facto* void; and that all grants of lands were to be on the condition of clearing the land in six years, and on failure of the condition, the grants to be null and void; and all grants are directed to be made contiguous to and adjoining each other : And by the *arrets* of the king and council, dated the 6th *July*, 1711, and the 15th *March*, 1732, all lands granted *en seigneurie*, or *en roture*, on condition of clearing and settling them, and which were not cleared and settled, within one year from the publication of the arret, are declared to be reunited to the crown. By an arret of the king, dated the 17th *July*, 1743, the governor and intendant of *Canada*, and *New France*, were directed to cause all the grants of lands forfeited, to be reunited ; and the rules were particularly laid down, by which the proceedings, in cases of the reunion of grants, were to be regulated.

It appeared, also, that at a superior council, held at the castle of St. *Louis*, in *Quebec*, the 10th of *May*, 1741, at the instance of the attorney-general, proceedings were had in regard to various grants, alleged to be forfeited to the crown; and the court pronounced judgment of reunion, amongst others, for the lands granted, on the 11th *April*, 1733, to *La Gauchetiere*.

The plaintiff also produced a copy of a conveyance, dated 14th *September*, 1726, from the sachems of the five nations, confirming and ratifying the surrender of all their

tions and proposals for grants of any part or parts of such lands, shall have been transmitted to one of our principal secretaries of state, in order to be laid before us, and until our approbation thereof shall have been signified to you, our said governor, or to the commander in chief of our said province, for the time being."

lands to the king of *Great Britain*, made the 19th *July*, 1701, to be protected, and defended for the use of the five nations, their heirs and successors ; a copy of a paper, filed in the secretary's office, indorsed 1688, purporting to be a report of certain commissioners of the king of *England*, by which it appears, that his majesty had considered the five nations as his subjects, pursuant to a voluntary submission by them to the crown of *England*, made the 30th *July*, 1684, before the governor of *Virginia*, and *New-York*, and was determined to protect them as his subjects, against the *French*.

Several other papers were produced, to show the submission of the five nations to the *English* government, and the protection afforded them, and also the opposition made by the governors of the *English* colonies, to the encroachments of the *French*, and particularly to the building of the fort at *Crown Point*, and on *Lake Champlain.*

The defendant, also produced the following papers : a certificate of a survey, made, the 21st *February*, 1766, by one *P. J. Labrosse*, one of the royal surveyors of *Canada*, appointed by the governor of *Montreal*, the 20th *June*, 1764, at the request of one *Francis Mackay*, in which he states, that he surveyed the manor, accompanied by *Mackay*, and run the lines which are described : a permission in writing from *Mackay*, to one *Francis L. Moule*, dated the 3d *November*, 1775, to go on and take possession of a farm, in the seigniory, of *La Gauchetiere*, on the west side of *Lake Champlain ;* a grant dated the 15th *January*, 1744, from the *French* governor, and intendant of *Canada*, to the *Sieur Estebe*, of the seignory heretofore granted to *La Gauchetiere*, captain in the infantry, which is stated as having been reunited to his majesty's domains, by the decree of the 10th *May*, 1741 ; a ratification, or confirmation of the same grant to *Estebe*, by the king of *France*, dated at *Versailles*, the 25th of *March*, 1745 ; a copy of a conveyance, dated the 22d *December*, 1757, from *Estebe* to *Marie Debreuil de Pontbriant*, bishop of *Quebec*, his heirs and assigns, of the same seignory or manor, and which, among

other things, was afterwards devised by the said *Marie De-breuil de Pontbriant*, to *M. Etienne de Montgolfier*, superior of the seminary of *St. Sulpice*, who, on the 27th *January*, 1768, executed a formal renunciation in writing, of the same seignory or manor, in favour of the heirs of *M. De Pontbriant*, lord bishop, &c.——a copy of a certificate from *Montgolfier*, dated 16th *May*, 1768, in which he certifies, that he claims no right or title to the said seignory, and a letter from him to *Francis Mackay*, in which he says, he sends him a quit-claim of all his right to the said seignory, by virtue of the will of the bishop *De Pontbriant*, which he wishes him to consider as gratuitous, and to enjoy the same, &c.

It was admitted, that in 1804, *Jonathan Schiefflin*, under whom the defendant claimed, had made leases to several persons in possession, in which was a proviso, that in case of any controversy, as to the right or title of *Schiefflin*, to the manor of *La Gauchetiere*, the lessees were to have no recourse against him for damages, &c.

Several witnesses were produced on the part of the defendant, who testified that they went into possession of parcels of land, within the seignory or manor of *La Gauchetiere*, by permission of *Mackay*, in 1763, and in 1774, and continued in possession until the *American* war, when they left their possessions, and returned again in 1784, but they paid no rent to any person, while in possession.

*J. Emott*, for the plaintiff.   1. The lessor claims under the patent from the province of *New-York* to *Dean*, in 1769.   It is admitted, that the premises in question lie within the boundaries of that patent ; it follows, that the plaintiff must recover, unless the defendant can show that the grant to *Dean* is inoperative.   This he has attempted to do, by setting up two grants from the *French Canadian* government, one to *De la Gauchetiere*, in *April*, 1733, and the other to the *Sieur Estebe*, in *January*, 1744.   The act of reunion, by the government of *Canada*, in *May*, 1741,

confirmed by the *arret* of the king of *France*, has annulled the grant to *De la Gauchetiere*. As there can be no doubt of the reunion of this grant, from the documents produced, and that it was done according to the laws of *France*, or the royal edicts, it is presumed that the first ground of defence must be abandoned.

2. It is well known, that about the year 1731, the *French*, in *Canada* and *Louisiana*, commenced a system of encroachments on the *English* colonies in *America*, for the purpose of confining the *English* to a narrow limit of territory along the sea coast, and to connect the *French* colonies together, so as to surround the *English* on the west. In the same year, the *French* took possession of *Crown Point*, and from that time, until the peace of 1763, made grants on both sides of lake *Champlain* and the river *Chambly*, comprehending all the lands on both sides of the lake and river. All these grants, it will be contended on the part of the defendant, are protected by the capitulation of *Montreal*, in 1760, and the treaty of peace, in 1763. The extent of the country comprehended in these grants, renders the cause of great importance, and will excuse the counsel for the plaintiff for taking a wider field of argument.

We contend, that by a just construction of the *capitulation* of *Montreal*, and the *treaty*, they do not extend to the premises in question.

The 37th article of the *capitulation* of *Montreal* declares, that the inhabitants of *Canada* shall preserve the property and possession of their goods, or estates, moveable or immoveable. This article can apply only to the country of which the *French* were then possessed, and which they surrendered by that capitulation. It cannot extend to the country which they may have possessed at any time before, and which they called *Canada*. The history of this country shows, that at some periods the *French* advanced on the *English* colonies, and, at others, the *English* colonists gained on the *French*; and capitulations between the two colonial governments have been made at different times. In the year 1759, the *English* had made considerable advances

on the *French*, in various quarters, and had gained possession of all the country on Lake *Champlain*, as far as the *Isle aux Noix*, which is beyond the 45th degree of north latitude. The *English* were, then, in actual possession of the country, comprehending the premises in question, for twelve months prior to the capitulation of *Montreal*.

But preliminary conventions made between belligerents, relative to the territories of each, are subject to the final and more solemn stipulations of the definitive treaty of peace. By the 4th article of the treaty of *Paris*, the king of *France* ceded to the king of *Great Britain*, the whole of *Canada*, in full sovereignty. The latter stipulates, that the subjects of *France*, in *Canada*, may retire, and for that purpose may sell their estates to *British* subjects. The right to emigrate is limited, however, to 18 months, and the treaty secured only a right to sell, in case the *French* emigrated within 18 months. In every other respect, the property of the people of *Canada*, belonged to the king of *Great Britain*, to be disposed of according to the laws and usages of nations. As in the present case, there was no emigration or sale within the 18 months, the property in question is not protected by the treaty of *Paris*.

Then, if the grant has any effect, it must be under the law of nations. Now, by a simple conquest, ratified by a treaty of peace, the possessors of the conquered country are all at the mercy of the conqueror. It is true, that according to the general usage of nations, the possessor of property, in a conquered country, on consenting to become a subject to the new government, acquires an imperfect right to his property. It is, however, in the discretion of the victor, to recognise this right or not. In the present case, there has been no recognition of these *French* grants, on the part of the *British* government. On the contrary, it appears from the acts and proceedings of the colonial government of *New-York*, that these grants were not allowed ; and that by the grant to *Dean*, the property in question was considered as a part of the domains of the *English* crown.

3. But admitting that the *capitulation of Montreal* is operative, and comprehended the property in question; still, after the conquest and cession, the possessor of the *French* grant could retain nothing more than an *equitable* or *presumptive* right to a confirmatory grant from the *British* government. It never can be supposed that the *French* possessor was to hold his lands, according to the terms of the original grant, a tenure so different from those of *England.* It was a tenure *en seigneurie,* somewhat analogous to the ancient *English* tenure *in chivalry.* The holder was to pay *faith* and *homage,* at the castle of *St. Louis,* in *Quebec,* and all other dues, according to *the custom of Paris.* He was invested with the power of holding courts of justice; and by the *arrets* of the *French* king, he could not transfer his seignory, and was bound to grant his lands at a reasonable ground-rent. By the construction of the capitulation and treaty, for which I contend, the property is so far saved, that the grantee has a prior and equitable claim to a confirmatory grant from the new government. That this is the just construction, is evident from the opinions of the council of the colony of *New-York,* expressed at various times, and from the practice in similar cases.

By the 3d article of the capitulation between the *Dutch* governor of *New-York* and the *English* deputies, by which the former surrendered the possession of *New-Netherlands,* in *August,* 1664, it was stipulated, that " all the *Dutch* people should continue free denizens, and enjoy their lands, houses, and goods wheresoever they were in the country, and dispose of them as they pleased ;"* yet we find, that the first act of *Nicolls,* the new governor under the duke of *York,* was to issue grants of confirmation to the *Dutch* patentees.†

4. But we contend further, that an act of reunion of the grant to *Estebe,* is to be presumed. The grant to *Estebe* was in 1744. It is evident, from the tenor of these grants, that the great object was to have the lands settled, as the strength and safety of the colony depended on the increase of settlements. There is no evidence of any settlement at-

ALBANY,
February, 1809.

Jackson
v.
Ingraham.

* *Smith's Hist. N. Y. (Cary's ed.)* 32.

† Ibid. 37.

tempted on the land comprised within the grant, until after the treaty in 1763, nor any survey thereof made. It is certain that there had been, long before, a breach of the conditions on which the grant was made.

[He then went into a minute examination of all the facts and circumstances of the case, from which an act of reunion was to be presumed.]

Should it be said, that if there was an act of reunion, the record might be produced ; it may be answered, that since the date of the grant, there have been three wars in *Canada*, and it is probable, that the records have been lost by some of the many casualties incident to a state of war. It would be for the interest of the *French* subjects to destroy these records ; and before, or at the time of the treaty of peace, they were probably suppressed by them.

Again, as the king of *Great Britain*, by the cession in 1763, acquired all the rights of the *crown of France*, and the grant had become forfeited by the non-performance of the condition, it reverted to the crown, and belonged to the king of *England*, without any *office* found.*

*Stephen* v.
*Potter*, Cro.
Car. 100.

5. The lands for which the grant to *Estebe* was issued, are not within the capitulation of *Montreal*, and the treaty of 1763, because, they were not only within the territory claimed by the *English*, but actually a part of the province of *New-York*, at the time the grant was made. The *English* line or claim extended beyond the lands in controversy ; and it will be sufficient, for the purpose of this argument, if it shall appear that there was a controversy existing, at the time, between the *English* and *French*, as to the northern boundary of the province of *New-York*, and that the former extended it beyond the lands in question. When, therefore, the *English* government, by the treaty of 1763, agreed to protect the property of *French* subjects in *Canada*, it must be understood to extend to grants in *Canada*, according to the *English* acceptation of the limits of that province, and this must be decided by the *English* courts. The *Dutch*, as early as the year 1649, claimed the country as

far north as the *St. Lawrence*, or *Canada* river.* In the duke of *York's* sub-grant, in 1684, the river *Canada*, is assumed as the north line of the patent. In 1696, the *English* government granted to one *Dellius*, lands situated beyond *Crown Point*. Again, the *English* claimed the sovereignty over the five nations, who were regarded as subjects to *Great Britain*, and their territory as the domains of the crown.† That the claim was known to the *French*, is ascertained by the protest and speech of governor *Dongan*, in 1686 and 1687.‡ It was solemnly recognised by the *French* themselves, in the treaty of *Utrecht*, *March* 31, 1713,§ and the treaty of *Aix la Chapelle*, in 1748.

The fact of the establishment of the sovereignty of the *British* over this territory, is proved by the history of the times. After the surrender of the *Dutch*, in 1644, *Carteret* had an interview with the chiefs of the five nations, and entered into a league of friendship with them, which continued uninterrupted for many years.¶ In *July*, 1701, a grant was made by the five nations to the crown of a vast tract of land,** comprehending the territories at the west end of lake *Erie*, and the north side of that lake and lake *Ontario*, and in 1726, those nations, by a solemn treaty made with governor *Burnet*, surrendered their whole country, south of the lakes, to the *British* crown, to be held for their use, and confirmed the prior cession of 1701.†† By these treaties of cession, these *Indian* nations acknowledged the *British* king as their sovereign and protector, and the *British* considered them as subjects of the crown, and protected them, on all occasions, against their enemies. That the lands in controversy are comprehended in the country possessed by the five nations, is an undoubted historic fact.‡‡ The committee of the council of the province of *New-York*, as appears from the records referred to in the case, considered it, in 1772, as a fact not requiring any proof; and it is within our own recollection, that these claims extended over all the north part of this state, and have been extinguished by government.

ALBANY,
February, 1899.

Jackson
v.
Ingraham.

* *Smith's Hist.* 16.

† *Smith's Hist.* 67.

‡ *Smith* 64.

§ *Smith*, 156.

¶ *Smith*, 35.

** *Smith*, 113.

†† *Smith*, 186, 187.

‡‡ *Jeffers. Notes on Virg. App.* note 5. *Smith's Hist.* 56. 151.

ALBANY,
February, 1809.

Jackson
v.
Ingraham.

2 Ruth. Inst.
361. B. 2. ch. 9.
sect. 7.

But it may, perhaps, be said, in support of the *French* grants, that they were made while the *French* were in actual possession of the country by conquest. But such a possession, according to the law of nations, gives no right.* No right can be acquired by a wrongful possession, unless it be afterwards acquiesced in, or conceded by the true owner.

*Van Vechten* and *Woodworth*, contra. 1. The defendant claims under the grant to *Estebe*. It is said, on the other side, that a resumption of this grant, by the crown of *France*, is to be presumed. We contend, that no act of reunion ever took place, nor is there, in the case, sufficient evidence to warrant such a presumption. The survey of *Mackie* is wholly inconsistent with the idea, that the grant had been resumed. That survey, too, was made by a royal surveyor, who would not have undertaken the survey, had the grant been extinguished by an act of reunion. Again, the act of reunion was to be made in a particular manner, with the forms and solemnities of a judicial act ; as in our law a grant must be avoided by an act as solemn and notorious as the grant itself. There must be some record of such a proceeding ; but no record of any act of reunion has been produced, except of the grant to *Le Gauchetiere*. Want of possession by the grantee, or the persons claiming under him, does not afford sufficient ground for the presumption, that the grant has been resumed. Immediate and successive wars in the country, sufficiently account for the want of possession. The premises lay on the frontiers, exposed to the incursions of the belligerent parties. This situation would afford an adequate excuse for not performing the condition of the grant, by making a settlement, and it is fair to presume, that such an excuse was received by the *French* government. One *Lafomber* went on the land in 1763, and persons, of the name of *Goude* and *Swarte*, settled there before the *French* war. *La Monte* took possession in 1774, and though interrupted by the subsequent war, he resumed his possession in 1784.

ALBANY,
February, 1809.
Jackson
v.
Ingraham.

In *December*, 1757, but three years before the capitulation of *Montreal*, *Estebe* conveyed the tract of land in question to the *Bishop* of *Quebec*, with warranty ; and it is not probable that he would have executed such a deed to such a person, if the land had been resumed by the crown. These conveyances were executed before public notaries, and were matters of record. It is sufficient, if the defendant can show a title out of the lessor ; but he has shown a title derived from the grantee. *Montgolfier*, in 1768, made a formal renunciation, or release, in favour of the heirs of the *Bishop* of *Quebec*. *Mackie* claimed as one of the heirs, and was admitted to be an heir by the release of *Montgolfier*. From that period, *Mackie*, and the persons under him, have claimed the land, and exercised acts of ownership over it. Though the patent to *Dean* was granted in 1769, there is no proof of any possession under it.

It may be objected, that the lease to *La Monte* was of lands in the seignory of *La Gauchetiere*, which had been resumed ; but this was merely a name of description, the first grant having been made to *La Gauchetiere*.

2. The title of *L'Estebe* was protected by the capitulation of *Montreal*, and the treaty of 1763. The estates of the *French* inhabitants were preserved, and they had a right to sell. The power to emigrate was limited to eighteen months after the treaty, but not the power to sell, which was unrestrained, except that the sale was to be made to *British* subjects. By the modern law of nations, individuals in conquered countries, are secured in their rights of property.* By the acts and declaration of the *British* government, the line drawn from the 45th degree of north latitude, was not to affect the king's new subjects holding titles to lands south of that line ; and it was provided, that actual settlers should have 50 acres of land for 3 acres improved. By the treaty of 1763, the *French* king merely renounced his right of sovereignty over *Canada;* the *French*, who chose to remain subjects of *Great Britain*, retained all their rights of property. Those who held legal titles under the *French* government, and were entitled to retain posses-

* *Vattel*, 573.

sion of their lands, would continue to have a right to hold them to the same extent, under the *English* government. The act of parliament, of 14 *Geo*. III. c. 33. though relative to the province of *Canada*, shows the sense given by the *British* government to the treaty of 1763, which was to secure the rights of property to all the inhabitants of the country, who took the oath of allegiance to the crown of *Great Britain*. The only inquiry of the new government would be, whether the grants were valid at the time of the surrender by *France*. The conduct of Governor *Nicoll*, in confirming the *Dutch* grants, has been mentioned; but that may have been for the purpose of raising money, and not because such confirmatory grants were absolutely necessary. Again, it is said, that the patent to *Dean*, connected with the treaty, is substantially a resumption of the *French* grant; but if the treaty confirmed and vested the rights under those grants, they could not be again divested by any acts of the *English* colonial government. The want of notice of these grants cannot be objected, as the *English* government was in possession of all the records. Again, it is not necessary for the defendant to prove, that the conditions of the royal grant were performed. *Dean* has no right to demand such proof. It belongs only to the crown, or those invested with the royal prerogative, to inquire into the performance of the conditions of the grants. The *English* government might enforce the performance in any manner it thought equitable.

3. The property, at the time of the grant to *Estebe*, was within the boundary of the province of *Canada*. The *French* were the first possessors of this country.* In 1638, the country north of *Albany* was called by the *Dutch*, *Terra Incognita*.† In 1674, *New France* was taken by the *English*. In 1678, Governor *Andross* speaks of the *lakes* as the northern boundary of *New-York*. In 1668, *New France* was restored by the *English*, without any specification of its limits. In 1672, *New-York* was retaken by the *Dutch*, who claimed the country ten miles north of the *Hudson*

* *Chalm. Pol. Annals*, 80. 82. 568. 585. *Smith*, 43.
† *Smith*, 16.

River.\* The *French* held the country by right of prior discovery, and by right of conquest. Their rights were acquiesced in by the *Indians*, and the limits of *Canada*, as fixed by the *French*, were recognised by the *English* in their treaties. The five nations did not reside within two hundred miles of the premises in question. If they had been driven from their lands by the *French*, their surrender and submission to the *English* could not transfer territory of which they were dispossessed. Besides, this subjection was very equivocal, and, at best, merely nominal. By the treaty of neutrality in 1686, the seventh article of the treaty of *Ryswick*, in 1677, the second article of the treaty of *Madrid*, in 1721, and the second article of the treaty of *Seville*, in 1729, *France* was confirmed in all her territories and possessions, which she held, by discovery or conquest, in *America*.† The fort of *Crown Point* was erected by the *French* in 1731. In 1732, the governor and council of the province of *New-York* inquired of the *Indian* commissioners, to whom the lands at *Crown Point* belonged; to the five nations, the river *Indians*, or the *French?* This shows, that the *English* did not consider themselves as the proprietors of this part of the country. In 1757, the northern limits of the province of *New-York*, were wholly undefined. By the map of *Evans*, published in 1755, the *English* claimed their northern boundary, no farther than *Otter Creek*. The very name of Lake *Champlain*, shows its *French* origin. The grant to *Dellius* was vacated, without ever having been carried into effect. Under the law of nations, a possession acquired by conquest, or first discovery, is a rightful possession. The *French* exercised acts of ownership over the whole country to which their claim extended. They built forts, and began settlements. These were conquered, and restored, at different times, and no precise line was drawn between the *English* and *French* provinces. The line of jurisdiction established in 1768, between *Canada* and *New-York*, incontestibly proves, that the respective limits of those provinces was not before well ascertained. In establishing the line at the 45th degree of

ALBANY,
February, 1809.

Jackson
v.
Ingraham.

\* *Chalm. Polit. Annals*, 579.

† *Chalm. Treaties.*

north latitude, provision is made that it shall not affect private rights acquired under the *French* government, prior to that period.

*Emott*, in reply, after making a few observations, was stopped by the court.

*Per Curiam.* This court cannot take notice of any title to land not derived from our own government, and verified by a patent under the great seal of the state, or the province of *New-York*. Whether claimants to lands within this state, founded on *French* grants, might not have had an equitable claim on the government, under the capitulation of *Montreal*, in 1760, or the treaty of 1763, is a question, with which this court has no concern. Such a claim might have been presented and urged to the government but it does not afford that evidence of legal title which can be recognised by this court. We can look no farther than to the titles derived under our own grants. This has been the uniform sense of our courts, from the first establishment of the *English* government in the colony of *New-York*.

The claim set up in this case, under the *French* grant, is not a new pretension. These claims were a subject of discussion with the government, before the *American* revolution, though this, perhaps, is the first instance in which it has been attempted, in a court of law, to enforce the claim, in opposition to a grant under the great seal of the state. In the year 1773, the colonial assembly published an elaborate vindication of the grants made under the seal of the province of *New-York*, up to the *Canadian* line, " upon the principle of original right, treaty and cession, law and justice, equity and policy." They declared, that the *Canadian* claims to lands south of the 45th degree of north latitude, were " extravagant and destitute of all foundation." But we do not think it necessary to look into the *equity* or merits of the claim. It is sufficient here, that it does not appear in the shape of a legal title. The *statement* published by the colonial legislature is referred to, principally, to show

their opinion, at that early day, on the question ; and it appears, that, by an order of the privy council in *England*, of the 12th *August*, 1768, (set forth in the statement,) no *Canadian* claim to lands south of the 45th degree of north latitude, was to operate, unless such claim was consummated and confirmed by a grant, " under the seal of *New-York*."

We are, therefore, of opinion, that the plaintiff must have judgment.

Judgment for the plaintiff.