DOE on the demise of LAFONTAINE and Another *v.* AVA-
LINE.

The act of *February* 11th, 1848, repealing the act for the relief of the *Miami* Indians, &c., of *February* 3d, 1841, and the act relative to suits against the *Miami* Indians, of *February* 11th, 1848, did not repeal the 3d section of chap. 28, R. S. 1843.

The courts will not construe a statute strictly, merely because it imposes disabilities, especially if, by strict construction, the object of the legislature would be defeated.

Protective and remedial statutes imposing disabilities upon persons *for their benefit*, must receive a liberal construction.

A person recognized as an Indian by the community, by the Indians themselves, by the State and federal authorities,—stamped as such by birth, education, and language,—and having three-eights Indian blood,

is held to be an Indian, within. the meaning of the statutes of this State relative to Indians.

The laws of this State relative to Indians, are in *pari materia*, and must be construed together, whether repealed or not.

Section 4 of the Indian act of *February* 3d, 1841, provides, "that in all cases, the provisions of this act shall extend to all persons of Indian descent, who are recognized as members of any tribe residing in the State of *Indiana*, down to those having *one-eighth* Indian blood." *Held*, that this is the legislative meaning of the word "Indian," as used in all other statutes of this state on the same subject, unless, from the context, or in terms, some modification was clearly intended.

*May Term,*
**1856.**

Doe
v.
Avaline.

ERROR to the *Miami* Circuit Court.

STUART, J.—Ejectment for a section of land in *Miami* county. Trial by the Court, and judgment for the defendant.

*Thursday,*
*May 29.*

The evidence, consisting partly of admissions, is all made part of the record, in the form of an agreed case.

Both parties claim title through *Catharine Lasselle;* the plaintiffs as the heirs at law, the defendant as the vendee of the devisee. *Catharine* was a daughter of the *Miami* chief, *Richardville*. Her first husband, *Lafontaine*, was also an Indian, and, at one time, head chief of the nation. After the death of *Lafontaine*, she married *Francis D. Lasselle*, to whom she devised the section of land in controversy.

*Lasselle* conveyed to *Avaline*, the defendant.

The lessors of the plaintiffs denying the validity of the will, claim as the heirs of the devisor.

The exact date of the marriage with *Lasselle* does not appear, but inferentially it must have been some time late in the fall of 1848; for the agreed state of facts, which will be more fully referred to hereafter, briefly says that "the marriage continued about six weeks." The will is dated 21st *November*, 1848, and speaks of *Lasselle* as then her husband. Her death occurred in the early part of *January*, 1849, taking six weeks from the date of the will as the duration of the marriage.

It is unfortunate that the evidence leaves such events as the date of her marriage and death in doubt. Matters of such notoriety could have been easily ascertained.

It is to be regretted that they were not supplied. A statement of these dates would have rendered all the argument addressed to that point, both by counsel and the Court, unnecessary, and thus superseded the minute examination which is required to reach these facts by inference.

There is no controversy but that the act of 1847, (p. 108,) giving married women the power to devise by "last will and testament," &c., was in force at the date of the devise by *Catharine Lasselle* to her husband. But, beyond the bare removal of the disability of coverture in that one particular, the act can have no bearing on this case.

The only question arising on the validity of the will, resolves itself into the competence of *Catharine* to devise. Was she, in *November*, 1848, a person competent to make a will under the laws of *Indiana?* To this end, we will inquire first, whether, when the will was made, there was any statutory disability resting upon the Indians in this State, rendering any contract or devise of their lands, in certain contingencies, void. And, secondly, if there was, was *Catharine Lasselle* an Indian within the meaning of these statutes?

First, then, as to what acts in relation to the Indians were then in force.

The first act in point of date, seemingly bearing on the question, is chapter 66, R. S. 1843. This act, approved *February* 3, 1841, is entitled an act for the relief of the *Miami* and other Indians. The first, second, third, and fourth sections abolish, as to the Indians, the writ of *capias* in all its forms. Suits brought against them are directed to be instituted by summons without bail. In brief, it abolishes imprisonment for debt, so far as these Indians are concerned, as one measure of relief to them. The other measure of relief is contained in the fifth section in these words: "No white man or negro shall hereafter have the benefit of any of the legal remedies for the collection of debts hereafter contracted by an Indian within the limits of the State of *Indiana;*

and all contracts hereafter made with Indians shall be null and void." R. S. 1843, p. 1038.

By joint resolution of the General Assembly, at the same session, approved seven days thereafter, the fifth section above recited was suspended for the period of five years. R. S. 1843, p. 1039. So that the fifth section of the act of *February* 3, 1841, did not go into operation until *February*, 1846. This act and suspending resolution are among the few enactments published at length in the R. S. of 1843, without revision or alteration.

In the body of the R. S. of 1843, chapter 28, treating of "real property and the alienation thereof," and under the particular head, "of the persons capable of holding and conveying lands," the third section provides, that, "No Indian can hereafter make any contract for or concerning lands within this State, or in any manner give, sell, *devise*, or otherwise dispose of, any such lands, or any interest therein, by which such Indian shall be divested of the absolute control, possession, or management of such lands, for a longer time than five years, without the authority or consent of the legislature of this State, except such sale, gift, or devise shall be to an Indian. R. S. 1843, p. 414.

The R. S. of 1843, in which this provision is embodied, took effect in the spring of 1844; at what exact time, is not material to the present inquiry.

On the 11th of *February*, 1843, a further act "relative to suits against the *Miami* Indians," regulating the mode of suing the individual Indians of that tribe, was approved, the third section of which declares that "every contract which may hereafter be made with any Indian shall be absolutely null and void." Gen. Laws, 1842–3, pp. 38, 39.

Thus stood the statute law of the State in relation to Indians, up to the early part of 1848. On the 11th of *February* of that year, an act was passed repealing the act for the relief of the *Miami* Indians, &c., of *February* 3, 1841, and also the act of *February* 11th, 1843, "rela-

tive to suits against the *Miami* Indians." But the third section of the twenty-eighth chapter, R. S. 1843, is not embraced in the terms of the repealing act. Nor does the act of 1848 repeal the third section of chapter 28, R. S. 1843, by implication. For it is not a repeal of all acts on that subject matter, but a repeal of two specified acts, particularly identified by the date of their approval. Each act repealed is specially designated in a separate section. There is no room to indulge a presumption that it was intended to repeal a third and separate act, on the same subject, which contains different provisions, was passed at a different time, and is not mentioned or included in any specific or general terms used in the repealing act.

The position assumed in argument, viz: that it was the intention of the legislature to repeal all acts relating to Indians, is, therefore, not only unwarranted, but repelled by the precise language used by the legislature to indicate how far, and upon what particular statutes the repealing act should operate. All implication is thus excluded.

The third section of chapter 28, as above quoted, stood as the law in relation to Indians during the year 1848. But on the 15th of *January*, 1849, that section, also, was repealed in terms of particularity similar to those employed in the repeal of the other Indian enactments; thus putting it beyond all doubt that the legislature did not repeal, nor intend to repeal, the third section in 1848.

That section, then, waiving, for the present, the question of Indian blood, is the law of this case, unless Mrs. *Lasselle* survived its repeal on the 15th of *January*, 1849. But that can hardly be made out consistently with the agreed state of facts. For the will is dated *November* 21, 1848. She was married then, and speaks of *Lasselle* in the will as her husband. The only evidence touching her death is, that "she married *Lasselle*, with whom she lived about six weeks, and died." The dates of the marriage and death are nowhere more par-

ticularly disclosed.    We must presume the marriage to have taken place *some time* before the date of the will; for it is not very probable that she would set about making so grave an instrument amid the festivities of her wedding-day.    If one or two weeks be assumed as a reasonable time for the marriage to have taken place prior to the date of the will, then the close of her six weeks nuptials would have been in *December*, 1848. This hypothesis would leave the third section above quoted still in full force at her death.

Even assuming the very great improbability that the marriage and the will bear the same date, the expression "about six weeks," does not save the devise from the operation of the statute.    For that language, "about six weeks," could hardly be expanded to cover a period of about two months.    These words would as easily cover a period falling short of six weeks as a period running over a few days.    The 3d of *January*, 1849, would be fully six weeks from the date of the will, leaving twelve days over to be covered by the word "about." This construction would clearly be more forced and unnatural than the other, which supposes the marriage to have taken place some weeks before the date of the will, and her death about the middle of *December*.

There can, therefore, be no hesitation in saying that, from the record, the third section of chapter 28, R. S. 1843, was in force at the time of her death.    That section, if applicable to the facts of the case, must govern the construction of the will.    *Kelly* v. *Stinson*, 8 Blackf. 387.

The section thus in force, and quoted in full above, may, so far as it bears on the supposed facts of this case, be thus abstracted, viz.  "No Indian can hereafter devise any lands, within this State, without the authority or consent of the legislature, except such devise be to an Indian."

It is not contended that the previous authority or subsequent consent of the legislature to the making of the

devise in question, had been obtained. Nor is it pretended that *Lasselle* was an Indian.

It, therefore, only remains to inquire, in the terms of the second proposition, was *Catharine Lasselle* an Indian, within the meaning of the act in force at the time of her death?

The first thing to be settled is the rule of construction by which this enactment is to be expounded. It is called by counsel on one side a disabling act, and hence it is insisted that it should receive a strict construction. That it imposes disabilities is to some extent true. It places serious obstacles in the way of the Indian who wishes to dispose of his lands. But these obstacles are designed for the Indian's benefit. No needless disability is imposed. It was very far from the object or purpose of the legislature to impose disabilities on the Indian, solely for the sake of embarrassing his action. The disability and embarrassment which ensue are mere unavoidable incidents in accomplishing the end to be obtained: they are not the end or purpose of the act itself. The avowed object of the act was the protection and relief of the Indians. It was to shield them from the wiles and fraudulent practices of their more intelligent neighbors. Hence, one of the acts already alluded to is expressly entitled "an act for the relief of the *Miami* and other Indians." Yet the act thus entitled (*February* 3, 1841,) was more stringent and disabling than that we are now considering. For the act now before us leaves the Indian at liberty to contract, with the previous authority or subsequent consent, of the legislature. But the act of *February* 3, 1841, declared all contracts thereafter made with the Indian null and void.

The fact, therefore, that a statute imposes disabilities, will not, of itself, induce the courts to construe it strictly, especially if, by so doing, the object of the legislature would be defeated. The effect of strict construction would be fatal to protective legislation. Almost all protective and remedial laws, in reference to persons, are disabling. The numerous enactments in relation to in-

fants, femes covert, lunatics, &c., are of this class. The disability is generally inseparable from the necessary protection; perhaps it might be said that the protection can only be afforded by imposing the disability. Such acts are entitled to a liberal construction, so as fully to accomplish the purpose of the law (1).

Thus has the Court heretofore regarded it, in the very analagous case in which the restrictions upon the power of the Indian to convey were imposed by treaty with the *United States*. Speaking of the provision formerly so common in Indian treaties, that they should not sell without the consent of the president, &c., this Court holds the following language: "The restrictions upon the Indians to convey were intended for their benefit, and such restrictions have always received a liberal construction. It is founded upon the supposition, that they are incompetent to traffic with the whites upon equal terms." *Harris* v. *Spencer*, 3 Ind. R. 494.

The generous intentions of the legislature are to be carried out by such a construction as will secure the contemplated relief to the Indian,—holding it rigidly to all who assume to deal with him in derogation of the statute. *Wendover* v. *Tucker*, 4 Ind. R. 381.

We come, then, to the main question in the case, viz. Was *Catharine Lasselle* an Indian, within the meaning of the act prohibiting Indians from devising their lands without the consent of the legislature?

The few adjudicated cases which we have been able to find touching the meaning of the word "Indian," as used in the statutes of the several states, present some apparent conflict. The nature of the Indian title, and the relative position of the Indian nations to the federal and state governments, have been accurately defined by the courts in a number of cases. *Fletcher* v. *Peck*, 6 Cranch, 87.—*Danforth's lessee* v. *Thomas*, 1 Wheat. 155.—*Cherokee Nation* v. *Georgia*, 5 Peters, 1.— *Worcester* v. *Georgia*, 6 Peters, 515.—*Clark* v. *Williams*, 19 Pick. 499.—*Brown* v. *Wenham*, 10 Metc. 495.—*Goodell* v. *Jack-*

son, 6 Cow. 693.—*United States* v. *Clarke*, 9 Peters, 168.—*Clark* v. *Smith*, 13 Peters, 195.

But what the legislature meant to include, under the term "Indian," does not seem to be conclusively settled by authority. In *Ohio*, the question has been determined by preponderance of blood. Persons of Indian or negro extraction, who have a preponderance of white blood, are declared to be "free white citizens," within the meaning of the constitution and laws of *Ohio*. *Gray* v. *The State*, 4 Ohio, 355.—*Jeffries* v. *Ankeny*, 11 *id.* 372.—*Lane* v. *Baker*, 12 *id.* 237 (2). But the statutes adjudicated upon were purely disabling, without any corresponding benefit, or intended benefit, to the parties on whom the disability was imposed. Hence, such acts came within the rule of strict construction, because their operation was against common right—excluding certain persons otherwise qualified, from voting, and from the benefit of schools. Even then the Court was not unanimous.

In *Tennessee* the courts seem to pay no regard to the preponderance of blood, but regard the habits of the party—the position in which he has placed himself, as the criterion. Thus, in *Tuten* v. *Martin*, 3 Yerg. 452, it was held that a white citizen of the *United States*, by marrying an Indian wife, residing among the Indians, and identifying himself with them, constituted himself the head of an Indian family, and upon being enrolled as such, was entitled to a reservation under the treaties of 1817 and 1819. Neither rule—the preponderance of blood, nor the habits and *quo animo* of the party—seems free from difficulty. But where there is Indian blood, conjoined with Indian habits and character, it would be taking hazardous liberties with language for the courts to say that such persons were not included within the terms of the third section of the act above recited.

That *Catharine Lasselle* was an Indian, in the ordinary and popular acceptation of the term, does not seem to admit of controversy. On that point, the following admissions in the agreed state of facts are pertinent and

conclusive, viz: "That the said *Catherine* has always been recognized by the community in which she lived, by the State authorities, and by the general government as a member of the *Miami* tribe of Indians; as, also, by the chiefs, warriors, and head men of the tribe; that she was so recognized in treaty stipulations, and, with others, was exempted, by act of Congress, from emigrating west. That the language of the *Miami* Indians was her vernacular tongue, and that she spoke that language al-. most entirely. That in *December*, 1842, and ever since, more than half of all the persons known, called, and recognized as Indians in this State, were not full bloods, but mixed, being part white." In the face of these admissions, it would be very difficult to find any reason for holding that *Catharine Lasselle* was not an Indian within the meaning of the statute. According to the admission, she was always recognized as an Indian by the State authorities: she, and such as she, were therefore, within the intention of the law-making power, when the word "Indian" was used in the act. Recognized as an Indian, as it is truly admitted she was, by the community, by the Indians themselves, by the State and federal authorities; her birth, education, and language stamping the same character upon her; the law under consideration, intended for the relief of the Indians, and, to prevent fraud, requiring a liberal construction; we cannot set aside all these, and decide simply on the preponderance of blood. On the contrary, taking all these admissions, in connection with the fact of her having three-eighths Indian blood, we think her clearly an Indian, within the meaning of the disabling act.

There is a further familiar rule of construction applicable to this case, which seems to remove all doubt. The several acts we have been examining all relate to the Indians. They are, therefore, in *pari materia*, and are all to be construed together as one act, whether repealed or not. Smith's Com. 751. The author refers to *Church* v. *Crocker*, 3 Mass. 21; *Thayer* v. *Dudley*, id. 296; *Holbrook* v. *Holbrook*, 1 Pick. 248; 10 *id.* 235; Paine R.

May Term, 1856.

Doe
v.
Avaline.

11; Dougl. 27; 1 Burr. 447. An examination of these authorities fully bears out the pertinent application of the rule to this case.

In one of these Indian acts the legislature have defined what they mean by "Indian." Thus, in the fourth section of the act of *February* 3, 1841, it is provided "that, in all cases, the provisions of this act shall extend to all persons of Indian descent, who are recognised as members of any tribe residing in the State of Indiana, down to those having one-eighth Indian blood." R. S. 1843, p. 1038 (3). This we must regard as the legislative meaning of the word "Indian" used in all the other acts, unless, either from the context or in terms, some modification was clearly intended. Nothing of that kind is contended for. Every consideration points directly to its deliberate use by the legislature in the same sense. 6 Bac. Abr. 379.—*id.* 382. In passing the third section, R. S. 1843, p. 414, the legislature must therefore be presumed to have had the fourth section of the act of *February*, 1841, in view. They must be taken to have used the word "Indian" in the one place, in the same sense in which they had defined it in the other. The Court is not at liberty to presume that in using the word "Indian" in the one act, the General Assembly designed to change its import, or use it in a different sense from what they had elsewhere defined it. Were *Catharine* herself alive, and claiming the protection of this act, we could not have a moment's hesitation.

We are clearly of opinion that *Catharine Lasselle* was an Indian, within the meaning of the laws of this State, and, as such, incompetent to devise. The judgment of the Circuit Court sustaining her will, must, therefore, be reversed.

*Per Curiam.*—The judgment is reversed with costs. Cause remanded, &c.

DAVISON, J., dissented.

*J. U. Pettit, N. O. Ross,* and *R. P. Effinger,* for the plaintiff.

*D. D. Pratt, S. C. Taber, R. Brackenridge, jr., I. Blackford,* and *A. A. Cole* for the defendant.

(1) In *New York*, it has been settled that the constitutional prohibition of purchases from the Indians was introduced for their benefit and protection, as well as for the good of the State, and that it is therefore, entitled to a benign and liberal interpretation. *Jackson* v. *Ingraham*, 4 Johns. 163.—*Jackson* v. *Waters*, 12 *id.* 365.—*Goodell* v. *Jackson*, 20 *id.* 693.—20 *id.* 728, acc.—*DeArmas* v. *Major*, &c., 5 Mill, (Louis.) 132.—*Baltimore* v. *M'Kim*, 3 Bland, 455.

(2) In *Jeffries* v. *Ankeny*, LANE, C. J., holds the following language: "The other question depends upon the construction of that passage of the constitution, '*free white citizens*,' whether it excludes from voting all persons having the intermixture of any other blood than that of entirely white persons. There have been, even in this State, since its organization, many persons of the precise breed of this plaintiff—I mean the offspring of whites and half-breed Indians—who have exercised political privileges, and filled offices, and worthily discharged the duties of officers. One such is now a clerk of this Court, and two are now members of this bar; and disfranchisement, for this cause, will be equally unexpected and startling.

"We regard this matter as clearly settled by the interpretation which the expression in the constitution has received by this Court, on the circuit, and in bank. In 1831, in the case of *Polly Gray* v. *The State of Ohio*, 4 Ohio R. 353; and in 1833, in the case of *Williamson* v. *The School Directors*, &c., Wright's R. 178, it was held that, in the constitution, and the laws on this subject, there were enumerated three descriptions of persons—whites, blacks, and mulattoes—upon the two last of whom disabilities rested; that the mulatto was the middle term between the extremes, or the offspring of a white and a black; *that all nearer white than black*, or of the grade between the mulattoes and the whites, were entitled to enjoy every political and social privilege of the white citizen; that no other rule could be adopted, so intelligible and practicable as this; and that further refinements would lead to inconvenience, and to no good result."

This ruling was affirmed by a majority of the Court in *Lane* v. *Baker*, 12 Ohio R. 237.

In *The People* v. *Hall*, 4 California R. 399, MURRAY, C. J., in a learned opinion, says: "In using the words, 'no black, or mulatto person, or Indian shall be allowed to give evidence for or against a white person,' the legislature, if any intention can be ascribed to it, adopted the most comprehensive terms, to embrace every known class or shade of color, &c. The use of these terms must, by every sound rule of construction, exclude every one who is not of white blood."

Again he says:—"The word 'white' has a distinct signification, which, *ex vi termini*, excludes black, yellow, and all other colors."

In *Medway* v. *Natick*, 7 Mass. 88, the Court said: "It is our unanimous opinion that a mulatto is a person begotten between a white and a black. This is the definition given by the best lexicographers, and we believe it also to agree with the popular use of the term. The pauper's father in

May Term,
1856.

this case was a mulatto, and her mother was a white woman. The pauper is then not a mulatto." To the same effect, see *Thurman* v. *The State*, 18 Ala. 276.

In *North Carolina*, a "person of color" is defined to be "a person descended from a negro within the fourth degree inclusive, though an ancestor in each intervening generation was white." *The State* v. *Dempsey*, 9 Ired. 384. The meaning of the word "mulatto" has been fixed in that State, by statute, in these words: "All free mulattoes, descended from negro ancestors to the fourth generation inclusive, though one ancestor of each generation may have been a white person, shall come within the act." And the State constitution, art. 1, s. 8 of the amendment, describes in the same manner "free mulattoes or free persons of mixed blood." *Id.*

In *South Carolina*, "The line of distinction between 'white persons' and men of color is not accurately ascertained. It means a person of mixed white or *European* and negro descent, without defining exactly the proportions of blood. A remote taint will not degrade a person to the class of persons of color—but a mere predominance of white blood is not sufficient to rescue a person from that class. It is held to be a question of fact for a jury, upon the evidence of features and complexion, and reputation as to parentage, and that a distinct and visible admixture of negro blood, makes one a mulatto. If the admixture of *African* blood does not exceed the proportion of one-eighth, the person is deemed white. This is the rule in *Louisiana*, and in the *code noir* of *France*, for her colonies." *State* v. *Davis*, 2 Bailey, 558.

In *Alabama*, a negro is defined to be a black man descended from the races of *Southern Africa*, and the word "negro" does not include the word "mullatto." *Felix* v. *The State*, 18 Ala. 720. And a mulatto is the cross between a negro and a white. *Thurman* v. *The State, supra.*