This was an action of ejectment, to which the defendants pleaded not guilty, and issue joined.
The plaintiff produced in evidence a grant from the State of North Carolina, to William Polk, for 5000 acres, dated April 17, 1800. This grant was founded on a removed warrant from John Armstrong's office, or the office opened pursuant to the Act of 1783, c. 2.2*
The plaintiff proved his boundaries, and that the defendants were settled within them.
The defendants produced a grant from the State of North Carolina to John Sevier for 25,060 acres, dated August 28, 1795, with mesne conveyances deduced from that grant to themselves, and proved that the tract of the plaintiff for 5000 acres lay wholly within the limits of the 25,060 acre tract, under which they claimed. This grant on the face of it states that it issued by virtue of forty warrants of 640 acres each, but does not express whether they are county, John Armstrong's, military, or pre-emption warrants. A part of the grant is gone, by accident or otherwise. It is the part which expresses the consideration. Grants for John Armstrong's claims, and some of the county claims, express on the face the consideration of ten pounds for every hundred acres. Other county claims express the consideration of fifty shillings.
Pre-emption warrants usually express a consideration of ten pounds per hundred. Military grants express a consideration of the "signal bravery and persevering zeal" of the officer or soldier. That part of the grant to Sevier which *Page 119 
is lost, respects the consideration received by the State. It stands thus: For and in consideration of _____________ p _____ unds. This grant or patent was sealed with the great seal of the State of North Carolina, and had on its face all the requisite forms of a State patent.
The plaintiff's counsel objected to the reading of this grant in evidence to the jury on the following grounds, which they said they were able to substantiate: —
First. By the laws of North Carolina, no grant could lawfully issue for as large a number of acres as are included in the grant to Sevier.
Second. Because the amount of the consideration, originally expressed on the face of that grant, appears to have been torn out.
Third. That said grant on its face appears fraudulent, the number of acres mentioned being 25,060, the number of warrants forty, of 640 acres each, and yet the courses and distances mentioned in its body include more then 50,000 acres.
Fourth. For the purpose of avoiding said grant to Sevier, it was offered to be proved that the forty warrants of 640 acres each, mentioned in the grant, under which the defendants claim, purport on their face to have been issued by Landon Carter, entry taker of Washington county; and that the land covered by said grant is situate between Cumberland Mountain and Tennessee River, and not within said county of Washington.
Fifth. That the consideration of ten pounds for every hundred (if originally in the grant), was fraudulently inserted by procurement of said John Sevier, the grantee.
Sixth. That no entries were ever made in the office of the entry taker of Washington county, nor elsewhere, authorizing the issuing of such warrants.
Seventh. That said pretended warrants are forgeries.
Eighth. That at the time of the cession of the western part of the State of North Carolina, now the State of Tennessee (see Act N. C. 1789, c. 3) to the United States, and at the time of the ratification thereof by Congress, on *Page 120 
the 2d April, 1790 (Folwell's ed. L. U. S. 92), said pretended forty warrants did not exist, nor were any locations or entries in the office of the entry taker of Washington county, from which they appear to have issued, authorizing their issuance.
Ninth. That no consideration for said land was ever paid to the State of North Carolina, or any of its officers.
Tenth. And for the purpose of proving that the consideration mentioned in said grant to John Sevier had been altered from fifty shillings to ten pounds, the counsel for the plaintiff offered to read in evidence a letter from the grantee, under whom the defendants claim, to the Secretary of the State of North Carolina in the following words: —

 "JONESBOROUGH, 12 NOV. 1795.

"DEAR SIR, — I am highly sensible of your goodness and friendship in executing my business at your office in the manner and form which I took the liberty to request.
"Permit me to solicit a completion of the small remainder in the hands of Mr. Gordon.
"Should there be no impropriety, I should consider myself much obliged to have ten pounds inserted in the room of fifty shillings. I have instructed Mr. Gordon to furnish you with a plat of the amount of three 640 acres, which I consider myself indebted to you for fees, c., which I beg you will please accept, in case you can conceive that the three warrants will be adequate to the sum I am indebted to you."
Eleventh. It was insisted that the person who had signed his name as deputy surveyor was not such, and therefore the grant was void.
 ARGUMENT FOR THE PLAINTIFF.
The counsel for the plaintiff, in support of these objections to the reading of the grant, said that if the truth of the case could be come at, they would be able to show a more stupendous fraud than was ever perpetrated in any country. The Yazoo speculation was but as an atom in *Page 121 
principle, compared to it. Can it be possible, in any civilized country whose laws are founded on the immutable principles of morality, that legal principles shall close the door against inquiry in such a case?
According to the doctrine which had been lately advanced, if an officer of government do an act it must be binding on all, however unjust and iniquitous. No matter who is injured, the State or an individual, it must stand good. The face of the patent, it is admitted, imports a presumption that the officers of the government of the State of North Carolina, who issued it, acted honestly and according to law. But the principle is well known, that presumptions only stand until the contrary be shown. We are prepared to show the contrary, if we are permitted. We state that these objections can be substantiated by proof. The Court must presume it to be true in this stage of the cause. A fraudulent transaction any person may show, though he be a stranger, and make such act void. If this were not the case, no person could be safe, and fraud would be patronized instead of being suppressed. The idea of the acts of ministerial officers being beyond inquiry, on the ground of fraud, is absurd, and contrary to every principle to be found in the books. The governor and secretary of North Carolina, who issued this grant, are nothing more than ministerial officers.
It is true, the entry books of Washington county, whence we say these warrants issued, have been destroyed or accidentally lost; but we have an abstract, showing the names of the enterers and the quantities entered. After the loss of the entry book, this abstract is the best evidence the nature of the case admits. Reporters of the decisions in other States show that fraud in obtaining grants may be inquired into. This has been particularly the case in Maryland and Virginia.
There is no law of North Carolina authorizing the issuing of grants for more than 5000 acres in any case, except in a few cases to officers in the army of a superior grade. This will appear by reference to the Act of Nov. 1777, c. 1, § 3, respecting county claims; the Act 1783, c. 3, § 9, John Armstrong's; and 1782, c. 2, § 6, the military claims. The Act of 1784, c. 19, authorizing the consolidation of claims, is confined to the swamp lands near the seaboard in North Carolina. It never was intended to apply to the middle, and much less to the western, part of the State. *Page 122 
On this ground therefore the grant is void, and ought not to be read to the jury. The secretary acts as a mere agent or attorney-in-fact in issuing the grant. If he exceed his powers, his act will be void.[1]
It has been urged that it was customary for North Carolina to consolidate claims for lands lying there, as well as in this State, and that usage is the safest interpreter of laws where they are doubtful. This we admit; but we never heard of such grants, except in a few instances to Stockley Donnelson.
The second objection is also material. As the grant stands, there is no consideration expressed on the face of it. It is unintelligible. A consideration is indispensable to the validity of a deed (2 Bl. Com. 296), and it was decided in the case of Butt's lessee in this court that the same rules and principles of law which apply to deeds apply to grants. An erasure or interlineation in a material part of a deed destroys its validity. Consequently the effect of this grant, as to the conveyance of the interest, is done away. False suggestions in a grant render it void agreeably to all the books; surely the part which expresses the consideration is material, and if there be any difference it must be the most so; it is therefore important this part of the grant should be preserved, and remain intelligible; without it the grant can have no effect. The consideration expressed, having been torn out, it was incumbent on the defendants to produce a registered copy of the grant, as the next best evidence; this they might have done; not having done so, it will be presumed this alteration was intentional and fraudulent.
The third objection to the reading this grant is very important, and on its result much of the interest of society depends. The grant is founded on forty warrants of 640 acres each (making 25,000 acres), and yet to calculate the acres included within the lines as called for in the grant, there are upwards of 50,000 acres. This could not have been a mere mistake in the secretary in making out the grant; the excess is too great for such presumption; there must have been fraud in this transaction; whether fraudulent or not the idea cannot be endured that the grantee shall be permitted to hold the whole of the land; if void for a part it is void for the whole. 17 Vin. Ab. 80. The maxim idcertum est quod certum reddi potest, strongly applies to this case. By calculation it can easily be reduced to certainty how much land there is within the bounds called for in the grant. *Page 123 
Fourth objection. "We say by recurring to the plat and certificate of survey annexed to the grant, the particular number of these warrants will appear. Neither the grant nor plat states what kind of warrants they were, whether county, military, or John Armstrong's warrants, but we can prove by the secretary of North Carolina, in whose office the warrants, under the authority of which the survey was made, are lodged, that they are Carter's warrants, or, in other words, were issued purporting to be in pursuance to locations made in the entry taker's office for "Washington county, of which Carter was entry taker. If permitted, we can further prove that warrants of the same numbers passed into grants elsewhere, and to other persons. This, however, is not the inquiry at present. The land now in dispute lies within the limits laid off for the satisfaction of John Armstrong's claims, agreeably to the Acts of April, 1783, c. 2; and April, 1784, c. 14, § 2. These lands were sold at ten pounds per hundred,[1] and the county claims or those from the entry taker's office of Washington county were sold by the State of North Carolina at fifty shillings generally, or at most but five pounds a hundred.[1]
These lands lie within the particular limits described and laid off by law, exclusively for the satisfaction of John Armstrong's claims.
Those are county warrants on which Sevier's grant issued, as we can show; they could not be surveyed and granted at the place where they were, which was intended by law for another purpose.
It is not reasonable to suppose that the legislature ever designed that county warrants, the consideration of which paid the State was only fifty shillings, should be surveyed and granted on the lands which it designed should be set aside for the satisfaction of those claims, for which it had received ten pounds per hundred.
Nor do the statutes warrant this idea; a short review will show this. The Act of April, 1783, c. 3, § 7, describes the boundary within which the military claims were to be appropriated; the eighth section forbids any other person except pre-emptioners, to enter therein within three years (§ 4); this exclusive right to the officers and soldiers was continued from time to time, as will appear by various acts, 1786, c. 20, §§ 2, 4; Act 1789, c. 69, as well as the decisions of the State courts in the cases of Overton's Lessee *Page 124 v. Philips and Campbell, and Goodloe's Lessee v. "Wilson.
The Act of 1783, c. 2, opens John Armstrong's office. The third section of this act describes what was usually called Brown's line, due north of the mouth of Cloud's Creek, westwardly of which it never was lawful to make entries in any of the county offices, April, 1778, c. 3, § 5, and the fourth section of the Act of 1783 show the same thing. April, 1780, c. 25, § 9, contains the same idea. The fifth section of the Act of 1783, c. 2, points out the lands designed for the use of the Indians, which narrows the Indian limits allotted by the Act of 1778, c. 3, § 5. At all times, however, it was unlawful to enter land within the limits allotted them. "We can show, if we be permitted, that the entries under which the defendants claim were made westwardly of Brown's line, and within the Indian boundary, and contrary to law. Many of the entries on which these warrants were issued, were made on lands for which there was no authority by law; therefore the grants founded on them must be void. But we contend that, admitting it to be law that warrants or entries can be removed to vacant lands, when lost by better claims, at the place originally located, — first, such removal must be confined to the limits of the country in which the original entry was made; and, secondly, if that be not the case, we contend that these removals cannot be made to lands appropriated to special purposes, as for military, John Armstrong's, and the Indian claims, pointed out as above; each species of claim was to be confined to its proper limits, within which other claims were forbidden, either expressly or impliedly, to be entered, surveyed, or granted. Now the warrants on which Sevier's grant issued were removed from the county of "Washington to the place where it was granted, within the special limits allotted for J. Armstrong's claims.
The two acts which authorize removals are April, 1784, c. 14, § 7, and October, 1784, c. 19, § 6. These acts were manifestly intended to apply to John Armstrong's claims alone; the captions and whole tenor of these two acts show that county claims were not intended. In aid of this construction, the reason of the thing is very forcible. The county claims cost but fifty shillings, and to permit their removal to lands on which individuals had an equitable lien from the limits laid off for J. Armstrong's, and the payment of higher consideration, would be absurd.
The correct construction, therefore, is, that these *Page 125 
removals should be confined to John Armstrong's claims; or, at least, if county claims should be permitted to be removed, it should be within the same county in which the entries were made; in either case the survey and grant of Sevier were not authorized by law, and therefore void.
It will be contended, no doubt, that matter dehors the grant cannot be received in evidence to destroy its validity; but, so far as it respects the introduction of the plat and certificate, the rule cannot apply in any event; it is a part of the grant itself, and is so considered by law. Any thing referred to by a deed, though not under seal, makes a part of the deed, and will be taken into view in its construction or otherwise.[1] In fact, any thing which has relation to the deed may be given in evidence.[2] It results from these authorities, as a necessary inference, that the plat and certificate of survey may be given in evidence, and so indeed may any other evidence showing the grant was improperly obtained and therefore void.
The fifth and tenth objections relate to the fraudulent conduct of the grantee and secretary of North Carolina, as respects the consideration of ten pounds for every hundred acres being inserted in the grant, instead of fifty shillings, which we contend was the consideration that ought to have been inserted, supposing the warrants to have been genuine. Will it ever be permitted to individuals to screen themselves under cover of a grant, when they have committed a fraud themselves, and procured an officer of government to commit one in issuing the grant? Fraud is so odious in the eye of the law that it vitiates and nullifies every thing it touches, or with which it is connected.
The sixth, seventh, eighth, and ninth objections, it is of importance to consider in one point of view. In fact, this general view which will now be proposed will embrace the eight last objections.
The general question is, Will evidence be received in a court of lawdehors a grant from the State to render it void or destroy its validity? In the examination of all the objections we have taken except the first and second, this question is important. We contend that, agreeably to the principles of the common law, the king's grants may be avoided in a court of law on the ground of fraud, deception, or false suggestions; and that the grants from the State are on the same footing. In various instances evidence to show such fraud or deception has been received in courts of *Page 126 
law under the general pleadings applicable to each action, as in 17 Vin. Ab. 78, 104, 114; 10 Co. 10, Legate's case; 4 Co. 71; 6 Co. 15; 1 Co. 40; 6 Mod. 229; 3 Co. 77; Burr. 396.
In England, grants are repealed according to the principles of the common law; it is done on the law, and not on the equity, side of the Court of Chancery. It is done in the petty bag; and no instance can be produced where a grant was ever avoided by the Court of Equity in England. They are either expressly repealed and cancelled, or considered as void, whenever, under the general issue in a court of law evidence is produced showing they ought so to be considered on the ground of fraud or deception. Courts of equity act in personam
only, not in rem. How, consistently with the primary principles of such a court, can the Chancellor proceed to cancel a patent when sitting in a court of equity? A court of equity would not relieve against a judgment at law,[1] how then can it be expected it would relieve against a grant improperly obtained?
The act reviving the Court of Equity in North Carolina 1782, c. 11, gave it the same powers usually exercised by the courts of chancery previous to the Revolution; hence, subsequent decisions of the English courts of equity, since the Revolution, ought not to be received in our courts. Many of them tend to enlarge the jurisdiction of the Chancery Court, and ought not to be adopted here. The true principle is, that where a person can get relief at law he cannot go into equity. The books show that for fraud in obtaining a grant remedy may be had at law.
The only case, we know of, where a person would be authorized to go into equity is to enable the youngest grantee to quiet his estate; by preventing multiplicity of suits.
Thus we have shown that a court of equity cannot give relief; a court of law therefore must.
What would be the use of driving a person into a court of equity, to be relieved against an act which is, and ought to be, absolutely void.
The policy of the law should make it the interest of every individual in the community to suppress fraud; therefore it results that an act void inits commencement is always void, no matter what subsequent circumstances may attend.[1] *Page 127 
If this fraudulent transaction originated with the governor of North Carolina, set it aside in the same manner you would do with an individual. The principle of the English law is, that every act in derogation of the rights of the king is void, so it is with us in relation to the State. It should be made the interest of every individual to take care of the public good. The public should not be cheated or defrauded, nor would it be unreasonable that every person in society should hold his property on that condition.
Our law has provided a remedy against the holding of more lands than a grant calls for,[2] — the surplus is to be thrown off. This, however, cannot be done in this action; and would it not be better that the grantee of this land should be obliged to give the whole of it up, than the State should be injured by being deprived of so much valuable soil?
Our objections suppose that the grantee never paid North Carolina, its officers, or any other person, a single cent for this land. Surely we shall be permitted to introduce such testimony as we have in our power to substantiate these objections. The officers of North Carolina were not authorized to issue a grant without the receipt of the purchase-money; if they did, their authority was exceeded and the grant void.
There are a variety of cases to be found in the books, in which extrinsic testimony was received in ejectment and other actions in courts of law to show that the king's grant was void on the ground of fraud or deception.[3] A consideration not expressed in a deed may be shown by plea or evidence, as well as any thing which has reference to a deed.[4]
There can be neither sound policy, nor any good moral reason, why extrinsic testimony should not be received to avoid this grant. 1 Fonb. 263.
There is a distinction, to be sure, between an act that isabsolutely void, and one that is only voidable, as may be seen from 1 Bl. 192, 2 Str. 1154; it is equally true that there are many cases where acts must be construed voidable only from their very nature; as in case of grants, our Act of Assembly having expressly said, that, unless registered within twelve months, they shall be void, yet the *Page 128 
court at Clarksville said it was only voidable, and by the State alone. The principal case, however, is different, as in contemplation of law the grant never had any force or efficacy; it was absolutely void on the ground of fraud.
Where the legislature of North Carolina has used the word "void" in any of its statutes, it intends to communicate the idea we have contended for, that the act thus spoken of shall be so considered either in law or equity, whenever such a case discloses itself by evidence, either directly or collaterally.
The ninth section of the Act of November, 1777, c. 1, is decisive on this ground. Agreeably to that section, if a grant be procured contrary to the provisions of, or in evasion of, that act, it will be void; that is absolutely void, not merely voidable.[1] The construction given by our courts to the expression "void" in the Acts of 1786, c. 20, § 1; 1787, c. 23, § 1, is, that the grants therein contemplated are absolutely void. These two acts produced the main question in the case of Vincent's Lessee v. Conrad.[2] It was on the ground of this construction that the practice obtained of permitting the entry to be given in evidence in a court of law to do away the effect of a patent. The eighth section of the Act of 1783, c. 3, respecting the officers and soldiers, received the same construction by the courts of the State, as is evident from the cases of Overton's Lessee v.
Philips and Campbell, and Goodloe's Lessee v. "Wilson.
The general principle of the common law we know is, that the oldest grant shall prevail against a younger one in a court of law; but, agreeably to our practice, founded on the Statutes of 1786, c. 20, and 1787, c. 23, a younger grant, when supported by an older entry, is permitted to be given in evidence in ejectment. This construction is agreeable to the principles of the common law, in relation to grants of the king. 2 Bl. Com. 348. This authority has given us a summary of the law of England on this point. If the king be deceived in his grant by fraud, false recitals, or false suggestions, his grant shall be void. Judge Tucker, of Virginia, is of opinion, that the same law which applies to the king respecting his grants, are obligatory in relation to the grants of the commonwealth.
We are told these defendants are innocent purchasers, and however fraudulent the transaction might have been, as between the State and grantee, it should not affect subsequent purchasers, who are innocent men; and the case *Page 129 
in the Supreme Court, respecting the Yazoo claimants has been mentioned in support of this proposition. We have heard much of the doctrine of innocent purchasers in this State, before the decision in that case; it is entirely new, and never was heard of in a court of law before. Suppose a man's horse is stolen, and sold to different persons who know nothing of the theft, will this give the purchasers an indefeasible right to the horse? The case of a gross fraud is perfectly similar. The State has been defrauded out of its land; it has never received a single cent as a consideration for it; the transaction is void in its commencement, communicates no right in the eye of the law, and consequently there is, legally speaking, no property of which subsequent purchasers can possess themselves, however innocent they may be.
When a title is fraudulently obtained, subsequent purchasers are in no better situation than the original grantee, who is guilty of the fraudulent act.[1] This grant, however, is fraudulent on the face of it, so that it does not fall within the principle which protects subsequent innocent purchasers. The courses expressed in the grant will show that it contains upwards of 50,000 acres, instead of 25,060, which is sufficient to put purchasers on an inquiry. Smith v. Lowe, 1 Atk. 490.
The eleventh objection presents a distinct ground; we say it appears from the plat annexed that George Gordon, who signed himself a deputy surveyor, surveyed this land, and that he never was a deputy surveyor, nor had any authority from the principal surveyor to make surveys. If he had any, it ought to be shown by the defendants who claim under the survey.
It would be the most unreasonable thing imaginable that the surveys of private individuals should be considered good against the State or individuals; the law requires that surveyors should give bond and security, by which a faithful discharge of their duties is secured; this is not the case with private individuals; the State has no security on them for their good conduct; consequently any act of such a person is void, and cannot be the foundation of any right.
The eighth objection requires particular examination. In the year 1789, c. 3, the State of North Carolina ceded to the United States her western lands (now the State of *Page 130 
Tennessee) on certain conditions; one of which (the second) secures to that State the right of perfecting certain inchoate titles. The right of removal, by this act, is confined to military and John Armstrong's claims; and it must be admitted that so far as this act is contrary to prior acts they are repealed; hence we say the Acts of April, 1784, c. 14, § 7, and October, 1784, c. 19, § 6, so far as respects county claims, are repealed.
The Act of Cession contains the terms of a contract between the State of North Carolina and the United States, which ought not to be evaded nor departed from. Besides, that condition of the cession, only provides for perfecting titles where entries had been made. In this case we say, and wish to prove, that no entries were ever made; therefore the power of perfecting titles which North Carolina had reserved to herself by the Cession Act has been exceeded in the issuance of this grant; it is therefore void, and particularly so as it is destructive of the rights of a third party, who had no agency in the issuing the grant.
Before taking leave of this subject, it is necessary to notice the construction put on the ninth section of the Act of November, 1777, c. 1. It provides that all grants obtained contrary to the provisions of the act, or in fraud, evasion, or elusion of it, shall be void; it has frequently been decided that all our land laws are to be taken as one in their construction; they are to be construed parimateria; hence it results that the provisions of the ninth section extend to subsequent acts. What is the meaning of that section is the inquiry. The defendants' counsel state that it only extends to such things as the laws require to be done previous to issuing the grant; is a part of the civil, and not political, institutions of the country, designed to regulate the conduct of individuals in relation to one another, and not their conduct in relation to the State. The words of the section are general; it contains no idea restrictive of its meaning, as the counsel for the defendants contend; why should it be restrained? There is no reason for it, either in public convenience or private morals. If a grant is unjustly and fraudulently obtained, it is correct it should be void; and what can be more unjust than obtaining a grant from the State without paying a cent for it.
In North Carolina it was a long time contested that a grant might be considered void in a court of law, by virtue *Page 131 
of the ninth section of the Act of 1777; at length after much contest it was decided that the propriety of obtaining a grant might be inquired of in a court of law.[1] The law has been considered as settled there, ever since, and so we expect it will be settled in this State.
 ARGUMENT FOR THE DEFENDANT.
We object to the testimony offered, not because justice is not on our side, for we believe it may be safely averred that, if the testimony were received, the defendants can satisfy the Court by evidence on their part that there was nothing immoral or improper in procuring the grant from the State. The defendants could prove, if it were necessary, the payment of the consideration money for these entries to the State of North Carolina. It might not have been paid at the time the locations were made, it might have been paid when the paper currency of the Revolution was much depreciated; it was, however, still a payment; was received by Carter the entry taker as such, for which he accounted to the State, agreeably to his bond and security,[2] or was held responsible, which was the same thing to us. Whether these locations were entered on the books of the entry taker, and thus technically speaking became entries, we care not though we are in-formed they were. It is admitted the entry books of Washington county were lost or destroyed about the year 1795. The plaintiff's counsel say they have an abstract (by some private individual, there being no law for it).
Every person who knows any thing of the state of the land claims in this country must be informed that this abstract is a very imperfect document; the book copied by the agent to North Carolina, respecting Carter's warrants, show this. The number of the entry or warrant in that office proves nothing; it was opened as early as the year 1777, and such was the imperfect manner in which it was kept. "We have no statute in existence, making this abstract evidence in courts of law. The twelfth section of the Act of 1807, c. 2, refers to this abstract, as evidence to the board of commissioners in adjudging unperfected land claims: with them it is not conclusive; it is only assistant.
It is further asserted by us that the warrants which authorized the issuing of the grant under which the defendants claim are genuine warrants, issued by Landon Carter, who was entry taker of the county of Washington. *Page 132 
But we ask how can their genuineness be proved otherwise than by the production of the original warrants in court. It is not pretended that they are in court; only copies are offered to be produced; the warrants are filed with the plat of survey in the secretary's office of North Carolina.[1]
A decisive answer is at hand for this part of the case; the officers of government who were employed to issue the grant were the proper judges whether the warrants were genuine or not. The emanation of the grant is conclusive evidence that they were, in any dispute between citizen and citizen; as between the State and grantee, the question might be different; but we hear of no complaint from that quarter.
After these preliminary remarks, we proceed to the examination of the several objections made by the plaintiff's counsel to the reading in evidence the grant to Sevier. It may not, however, be unimportant to inquire, in the first place, whether the present application to reject the grant be not a little singular. The plaintiff has instituted a suit, which supposes an injury; how can the plaintiff say he has been injured? In the year 1795, the State granted the land to Sevier; the plaintiff then had no claim to this land, neither equitable nor legal. He had made an entry for 5000 acres it is true, but in another place, perhaps a hundred miles from the place now claimed; in the year 1800, he removes this entry, surveys, and obtains a grant as now claimed.
This is a succinct but correct history of the plaintiff's claim. What right has the plaintiff to complain that the State had granted this land to Sevier in 1795? He had no claim to it at that time to be affected. The State was competent to grant it, and to judge of the evidence necessary to authorize such grant. Suppose the State was defrauded, was this any thing to Polk, who had not taken any step to appropriate this land? The case of Upton v. Baliffe, Cro. Eliz. 445, shows the idea of the common law in relation to this subject. At the common law there was not any fraud remedied which should defeat an after purchase, but that only which was committed to defeat a former interest. When the State granted the land to Sevier, Polk had no former interest to be defeated. This principle of the common law is not, in general, unreasonable. The statutes of the 13th and 27th of Elizabeth respecting *Page 133 
fraudulent conveyances, it is true, has introduced a new principle, but it cannot apply to the present case.
The common-law principle is expressly recognized in the treatise on fraudulent conveyances by Roberts, pp. 7, 8, 9, 14, 32, 59; so is the alteration by the introduction of a new principle, pp. 35, 40, 46-59, 463, 464. It is by these statutes that subsequent legal purchasers are enabled to invalidate prior conveyances on the ground of fraud; and this provision is intended principally as a punishment on the person conveying with a fraudulent intent. It is the intent or malafides of the person conveying which brings the statute into operation. From the nature of things, this principle of the statute law cannot apply to the case before the Court.
Who is it conveys in this case? The State. Now the State, in legal presumption, could not have conveyed to Sevier with an intent to defraud any person; we say neither the principles of the common law nor of the statutes will enable the plaintiff to support the objections he has taken to the reading this grant.
On this ground, however, we do not mean to place our reliance entirely; the objections are opposed by the clearest principles of law.
The first four objections will be separately considered.
It is said there is no law in existence authorizing the issuing of a grant for more than 5000 acres; that ours is for 25,060 acres, and therefore void. To this we oppose the sound and correct interpretation of the Act, April, 1784, c. 19, § 3, together with the usage of the State in issuing grants since the passage of that act. The act is in these words: "Where two or more persons agree to have their entries surveyed in one or more surveys, the surveyor is hereby empowered and required to survey the same accordingly in one entire survey." In the principal case it appears, the survey was made by virtue of forty warrants founded on as many entries; the presumption of law is that these entries were made in the names of different persons,[1] and as the law permits the assignment of entries and warrants, it is also a legal presumption, that the whole of these forty warrants were assigned to Sevier, to whom the grant issued. Sevier having obtained all these entries or warrants by assignment, he applied to the surveyor to *Page 134 
survey them in one entire survey. Could he, consistently with the spirit and meaning of the law, refuse it? He could not; the consent of any other person than Sevier was not necessary. He owned these warrants, and in him was concentrated, by assignment all the power of consolidating the claims that resided in the original claimants. But we are told that the first section of the Act of April, 1784, c. 19, which contains the preamble, is a key to unlock the meaning of the act. The preamble speaks of the difficulty in surveying swamps in the eastern part of the State.
We admit the section provides a remedy for the evil complained of in the preamble, and is particularly applicable to swamp lands. The third section is a general provision, applicable to all kinds of land in every part of the State; its words are general, and we cannot suppose the legislature meant the same thing it did in the second section, — to enact the same thing over again.[1] If this act were doubtful, we might recur to usage under it.[2] What has been the practice of the State under this law? To consolidate claims whenever desired; witness the large tracts granted in North Carolina about the years 1794 and 1795, to Allison, the Blounts, and others, when the rage for land speculation ran so high. So it is with respect to grants by North Carolina for lands in this State, where a number of large tracts have been granted to different individuals. Did any person ever hear till now that those grants were void? If so, thousands of innocent families will be turned out of house and home in both States.[3]
The second objection is almost too frivolous to require refutation. It is manifest how the grant stood; that the consideration was ten pounds per hundred. It must have been pounds, and whether five or ten is unimportant; it must have been one or the other, there being none other known of in the law. The habendum in the grant shows it to have been the intention of the State that the grantee and his heirs should hold this land to their own use, and by our law as to deeds a consideration is not necessary.[4]
The books all agree that it is not necessary that a consideration should be expressed on the face of a bargain and sale; it is sufficient that it was paid, and may be proved aliunde.[5] In 1 Hay. 99, a grant was permitted to be read, though the seal was torn off. In bargains and sales, if it be for and in consideration of money received, it is sufficient without specifying the particular sum.[6] *Page 135 
We refer the Court also to Johns. 402; Maryland, 227-229, 331. The grant should not be adjudged void if by any principle it may have effect.[7] In deeds of feoffment no consideration is necessary to the passing of the estate.[8] The general principle of the common law is, that instruments under seal ex rei naturâ import a consideration, and surely there is much greater reason for the application of this principle, as it respects so solemn an act, as a State grant.
The third objection is equally untenable. Whether the courses and distances expressed in the grant, on calculation by a surveyor, would contain more than 25,060 acres we are unable to say; or whether the lines will actually measure the distances called for is uncertain: perhaps the surveyor has made a mistake in calling for the distances. The truth of the case is, we know, that there is not near the quantity of land called for, beside older and better claims. The State might have taken that circumstance into consideration, and no doubt did; for the plat will show that older claims were thrown out. For argument's sake, we will admit that the lines are actually of the length, called for; still the grant is good for all that is contained within the lines as actually marked. This has been too often decided to be brought in question now.[1]
The other objection we shall consider specially in proper time, but we have one argument which applies to the whole of them. Shall evidencedehors the grant, he received in a court of law to destroy its validity? We say not, and we think this can be established by the principles of the common law, adjudged cases, and public convenience. A principle which pervades the last eight objections of the plaintiff involves the following suppositions: first, that it is proper to read the plat and certificate of survey as a part of the grant, or as evidence dehors; secondly, that, on reading the plat and certificate of survey showing the numbers of the warrants, it will be proper to go further into extrinsic testimony to prove that these were county warrants, with circumstances to show that there never were any entries or genuine warrants, and that no consideration was paid the State.
The propriety of these inquiries has been urged on principle of common and statute law. It is insisted that the *Page 136 
plat is a part of the grant; our Act of Assembly will settle this point. The tenth section of the Act of November, 1777, c. 1, directs that the surveyor shall make two plats, which he shall return to the secretary, who shall file one in his office and annex the other to the grant. If it were the intention of the legislature to make it a part of the grant, it would so have expressed itself; but it conveys a very different idea by saying it shall be annexed. Again the eleventh section of the same act directs the secretary to make out grants, and record them in his office before delivery to the owner. What has been the practical construction, not only of the secretary uniformly and from the earliest date, but of the registers in the different counties in relation to recording grants? Have they deemed it necessary to record the plat and certificate of survey, as being part of the grant? No: they have not; gentlemen cannot dispute what we assert, that neither the secretary of North Carolina, nor the registers of the different counties in the State, ever thought the law required the registration of the plat and certificate of survey. The tenth section conveys a clear and distinct idea to the contrary, when it requires the secretary to file one of the plats in his office; if it intended to have it recorded it would have made use of the wordrecord instead of file. Did you ever hear of an objection in a court of justice to the reading a grant or a copy, that the plat and certificate of survey were not annexed in the one case, or certified as a part of the copy in the other? Never. Would it not have been made before this, had it been esteemed an essential part of a grant? Surely it would.
As our law required grants to be registered in the secretary's office, as well as in the counties in which the land might be situated; as grants, without the plats and certificates have uniformly been registered in all these offices, and all this acquiesced in without an expression of a doubt, either in or out of court, we may fairly conclude the law did not consider a plat and certificate of survey as part of a grant at all. "What design the legislature had in requiring that it should be annexed to the grant is unimportant; perhaps to exhibit to the claimant a more perfect view of his tract to enable him to sell it with more facility, or as affording further information than could be obtained from the face of the grant. Beside these considerations, it might be useful in enabling the secretary to make out a grant with correctness. Be these matters as *Page 137 
they may, we hold it as clear law that the plat makes no essential part of the grant, and as such cannot be read.[1]
If received at all, it must be under the general principle that extrinsic evidence may be received with a view to invalidate a grant. This brings on the general question.
In England, the doctrine of considering grants void in courts, in a variety of instances, seems incident to the rights of prerogative.[2]
Amidst the numerous and contradictory decisions to be found in the English books on this subject, a sensible distinction is recognized; it lies between grants made on the suggestion of the grantee, as expressed on the. face of the grant, and where the letters-patent are the words of the king.[3] Various statutes in England have required these suggestions to be stated in the grant.[4]
The statute law of England respecting prerogativa regis never was adopted in this country. By statute, these suggestions or recitals of the information received from the applicant (grantee) for a patent were intended for the king's benefit. If false, the statute enacted that grants should be void.[5] The motive for granting was expressed in the grant by way of recital. By law it was incumbent on every person to examine into the truth of the statements made in the recital; if the king was deceived the grant was void. In common sense, there should be a distinction between grants where the consideration has been received, and so affirmed by the king, and where they depend for their consideration on the suggestion of the party. Hence we see that when the king designs to make an indefeasible grant he does it of his special grace and mere motion, or expresses the consideration to have been received.[1] The authority relied on by the other side,[2]
that a grant void in part shall be void for the whole, shows that the case only applies to the king, and that, too, in the case of independent clauses. The law is not so, says the book, when applied to a common person.[3] With these distinctions respecting the king's grants, viz., those founded on affirmation and those founded on suggestion, or, in other words, assertive andsuggestive, the differences in the books may be reconciled. Our grant contains no recital, and is of the assertive kind. The first class is bottomed on the knowledge of the person conveying;[4] the other on the information of others. Where the books speak of the king having been deceived, and that therefore the grant is void, we expect the consideration of such a grant to *Page 138 
have resulted from information, a case of recital as in 17 Vin. Ab. 78, 104, 114; 10 Co. 110, Legate's case; 4 Co. 71; 6 Co. 15; 1 Co. 40; 6 Mod. 229; 5 Com. Dig. 281, tit. Patent, F, 1 E, which have been relied on by the plaintiff: all of which either belong to the last class of cases, or do not apply to that before the Court. The case in 1 Burr. 396, was an action on the case, and that in 3 Co. 77 in chancery.
We admit the distinction laid down in 1 Fonb. 122, c. 2, § 8, n. z. in notes. In this we perceive a judicious compilation of the exceptions to the general rule of law, that evidence dehors
shall not be received to impeach or destroy a deed or grant. Patents vest such a title as cannot be disputed or divested in ejectment.[5]
The last ease is an adjudication precisely in point.
The general rule of law is, that extrinsic testimony shall not be received to destroy a grant or deed.[6] The case before the Court falls within none of the exceptions to the general rule as laid down in 1 Fonb. 122 n; and this general rule excludes the testimony now proposed to impeach the grant to Sevier.
There is a clear distinction to be found in all the books, between acts which are absolutely void and such as are onlyvoidable.
It is illustrated in Whelpdale's case, 5 Co. 119, and in Bacon's Ab. tit. Void and Voidable.
In England, the king's grants shall be construed to take effect, if, by any legal means they can, and always favorably for the subject.[1] *Page 139 
The authorities adduced by the plaintiff's counsel, showing that instruments referred to in deeds may be received in evidence under certain limitations, we admit are correct. We have already spoken in answer to them. No instance, however, has ever occurred in courts of law, where such evidence was received, with a view to destroy the validity of a deed, except in the cases referred to in 1 Fonb. 122, c. 2, § 8, n. z, and under particular statutes, as concerning fraudulent conveyances, gaming, c.
From a full and correct view of all these cases, we conclude the general principle of law is, that evidence dehors a grant cannot be received to impeach it; and, consequently, that the evidence now sought to be introduced cannot be received.
We have been told that courts of equity have not power to avoid a grant, and that no instance has ever occurred in an English court of equity. In answer to this assertion, we refer the Court to 17 Vin. Ab. 119, pl. 22; 1 Ver. 270, 370, 390, where the reverse of this proposition is expressly laid down; we also refer to the practice of every State in America, where there is a court of equity. It is particularly insisted on, that our courts of equity have no such power, whatever might be the case in England. In that country, the jurisdiction of the Court of Equity has been continually increasing; this cannot, say our opponents, be the case here, because the Act of 1782, c. 11, establishing our courts of equity, has limited its powers to the cases of which such courts had cognizance previously to the Revolution. This reasoning is by no means admitted. The second section of the act provides that the Court of Equity shall possess such powers "as are properly and rightfully incident to such a court." Law, as well as equity, finds its limits in principle, and not in precedent. The latter is only evidence of the former.[2]
For the sake of uniformity, to prevent misconception and misapplication of principle, we admit it is of much importance to the happiness of society that precedents should not hastily be departed from. It must not, however, be forgotten that there shall be no injury without a remedy; and, in all cases, which the forms of law cannot reach, a court of equity must,[3] unless opposed by public policy or convenience. Hence it is essential to the very existence *Page 140 
of a court of equity, that, as society progresses, new species of injuries arise, and with it an increase of equitable precedents, — not an increase of jurisdiction, which exists in principle, as we have before observed. The nature of things points out an equitable court, as the proper forum to impeach a grant. There, parties can be apprised by their pleadings of the nature of the complaint and defence; this cannot be done in ejectment under the general issue. All the books show, in ejectment, nothing is contemplated but legal title and boundary. The idea that a court of equity can only act in personam, and not in rem, is of very ancient date, and by no means comports with the powers possessed by such a court at this day, either in this country or in England. Almost half the cases in our courts are predicated on a different idea. Our statutes, N. C. 1787, c. 22, and Tenn. 1801, c. 6, § 48, are extensive in their operation on this ground.
It has been strenuously contended on the other side, that whatever may be their fate, agreeably to the authorities, yet the ninth section of the Act of November, 1777, c. 1, lets in the testimony contended for. Let us briefly examine whether this section has introduced any new principle into the law. It provides that every title, c., to land, c., which shall not be obtained agreeably to the provisions of that act, or in fraud, evasion, or elusion of it, should be void. What were the provisions of this act, is the first inquiry: first, to sell;[1] secondly, that purchasers should be citizens, or should take an oath of allegiance;[2] thirdly, the mode of instituting a claim after payment, by making an entry;[3] fourth, that settlers should have a preference in purchasing; fifth, a remedy to settle all disputes by caveat;[4] sixth, method to be observed in making surveys, grants, security for the good behavior of the officers employed, c.[5]
This act had obviously in view two primary objects: security to the State, and security for the rights of individuals; how did the legislature provide for the first? It is answered by requiring an oath of office, with bond and good security from its officers.[6] In further confirmation of this, idea, and that it was the uniform practice of the government of North Carolina, to hold their officers responsible, we refer to the acts[7] requiring entry takers to give bond once in two years, or their offices should be vacated, § 4, and to return a list of entries once a year to the comptroller of the treasury, for which they were to be held *Page 141 
accountable. Act 1794, c. 17, § 2, complains that entry takers had permitted entries to be made without paying the purchase-money, therefore § 2 forbids the entry takers to receive any money in future for entries thereafter to be made, and that persons who shall make entries should pay the consideration immediately to the treasurer of the State. In 1795, c. 17, entry takers were forbidden to concern with entries made between 1777 and 1795; that they should put the entry books into the hands of the respective clerks of counties. Act 1796, c. 7, § 9 required entry takers to transmit periodically lists of all entries made in their offices to the treasurer of the State, from which he was enabled to bring enterers to account for the purchase-money. Thus we have a history of the accountability of entry takers to the State. This view of the subject clearly proves that the legislature discovered some of those officers had not accounted to the State for the moneys arising on the respective entries made in their offices. Each entry taker was held accountable for every entry made in his office.[1] When land speculation was running high, on account of the influx of discontented Europeans, many of the entry takers of North Carolina were prevailed upon to suffer entries for large quantities of land to be made without payment of the purchase-money: speculators were trusted; of course many of them deceived, and never paid a cent. Was it ever supposed by any person that these grants were void? This happened in North Carolina about the year 1795. Is there a lawyer at the bar, either in North Carolina or this State, who ever supposed the State could resume these lands after being granted? No, not one, we will venture to say. Can the gentlemen on the other side show the smallest intimation by the legislature of North Carolina that it considered grants for lands not paid for void? When its own acts show a conviction that entry takers had failed to account, is it not natural to suppose it would in some of these acts have declared grants thus obtained void, if it thought so. It never did, nor by any act of its government were these lands resumed. In the Act of October, 1784, c. 19, § 3, the receipt of counterfeit certificates is complained of, but no declaration that grants should be void after going out of the office. How far the legislature might go whilst the property remained in the hands of the person committing the fraud we will not undertake to say. But we deny that North Carolina had any power to nullify a grant against innocent subsequent purchasers as our *Page 142 
clients are; this point is so clear that we will not insult the understanding, nor impose on the patience of the Court, by an attempt to argue it. A law book can scarcely be opened but you see the recognition of this principle.[2]
After the year 1795, when the State had been very much injured by the insolvency of some of its entry takers, it became still more cautious as appears from subsequent acts. In November, 1795,[3] it is provided, if entries be not paid for within six months, the claims shall lapse or be forfeited; the time for payment was occasionally enlarged as the legislature thought just.[4] As early as November, 1794,[5] North Carolina determined not to issue any grants to individuals on entries after that time without a receipt from the chief officer of State (the treasurer) that the money was paid. The Act of 1798, c. 4, §§ 1, 2, provided a method, by which proof should be made respecting the payment of the consideration in other cases.
The State has appointed its own officers for the purpose of perfecting titles; it has taken what security was thought proper for their good conduct, as it respected itself, and as it might respect the citizens at large. Our clients had nothing to do with their appointment, nor any control over them; therefore, what could be more cruel and unjust than that they should be affected by the conduct of those officers; it is opposed to every idea of national faith, honor, and consistency. We hold it to be a self-evident truth that a State cannot disavow its own act (or the act of its officer which is the same thing) to the prejudice of a third person, relying on the ordinary legal evidences of titles. It is a maxim of equity and of reason, in a dispute between two persons who are equally innocent, that he who trusts most shall suffer most.
This view of the subject leads us to believe, that, wherever the State has made a grant the law presumes that it is just and legal; that in disputes between man and man it will not permit any evidence to be received to overturn this presumption, which it considers as highly beneficial in preserving the order, peace, and happiness of society. Fraud is odious in law and never presumed. From this part of the argument, we may fairly conclude that it could not have been the intention of the legislature in passing the ninth section of the Act of November, 1777, c. 1, to make grants void, when coming collaterally into view, on the ground of any act which would affect the State. *Page 143 
Our next inquiry is, how far the ninth section will render grants void, on the ground of non-compliance with the provisions of the act, in relation to the rights of citizens. We have already examined whether the validity of grants can be affected by an infringement of the rights of the State in obtaining them. With a view to a correct construction in this respect, it may not be amiss to observe that, at that time, North Carolina had not any court of equity; and, consequently, we believe, the only remedy designed to adjust disputes between individuals, was a caveat, as provided in the fifth, sixth, and seventh sections of the act. This remedy was intended to enable individuals to adjust their disputes before the emanation of a grant. It embraced all cases, and ever has been considered as an equitable proceeding. We therefore conclude that the only case in which the ninth section could possibly operate agreeably to the intention of the legislature was where an individual had surreptitiously obtained a grant before the expiration of the time allowed to caveat, which was three months, agreeably to the fifth section.[1] After affording this opportunity to contest, the legislature presumed no citizen ought to be dissatisfied, or have any further remedy.[2]
It is true, since the revival of the Court of Equity the remedy bycaveat has in most instances been considered as no bar to a suit in equity. This, however, results from the nature of equity; in cases respecting inheritance, one trial never has been considered as conclusive in equity[1] in addition to the unforeseen grounds of complaint noticed in the acts of North Carolina.[2]
We have been told by the opposite counsel that the construction put on the expression void under the Acts of 1786, c. 20, and 1787, c. 23, serves as a further illustration of the doctrine they advocate. Laws made on the same subject, it is said, are to be considered together, and the same expression should have the same meaning annexed to it, though used in different acts; hence they conclude that the expression void, used in these two acts, having been construed to meanabsolutely void, that the expression void in the ninth section of the Act Nov. 1777, c. 1 should bear the same meaning. *Page 144 
We do not admit that the same expression must bear the same meaning at all times; it depends on the context. Our reasoning in relation to the meaning of the ninth section of the Act of 1777 renders it unnecessary that we should examine the question any further with that view; because we insist that, admitting the ninth section to have the meaning they contend, it does not nor ever was intended to apply to the principle which pervades these objections, — the admission of testimonydehors a grant.
A few remarks will suffice respecting the construction put on the Acts of 1786, c. 20, § 1; 1787, c. 23, § 1. In relation to the single point of the reception of an entry against a grant, it has been determined that the expression void, used in these acts, is to be construed absolutely void. Further than this the State courts have refused to go. In this opinion there always was a division in the Court, and no doubt can be entertained that the decision was not conformable to the principles of law.[3] In further corroboration of this idea, we have only to remark that it is directly opposed to the contemporaneous construction of those acts.[4] North Carolina, by whose legislature these acts were passed, has uniformly to the present day, through the medium of its courts, refused to admit an entry, or any other extrinsic evidence, in opposition to a grant. Now, it is evident that the courts of one or the other of the States are wrong; and this court is at liberty to say what is the law in this respect. One thing is certain, that the admission of the entry with concomitant proofs in evidence has been the parent of endless confusion and litigation ever since the decision took place. We have been told in argument by the other side, that the law as now settled in North Carolina, permits extrinsic evidence to be offered to do away the effect of a grant, and for this purpose 2 Hayw. 98 has been relied on. Gentlemen will not surely seriously affirm that such is the understanding of the courts at this day, or ever was; they cannot do it, for the practice is well known to be otherwise there. Nor does the decision referred to, in any manner warrant the assertion made; the case decides no such thing; it only decides the grant was void, having been made previously to the Revolution, which is correct, agreeably to the Act 1777, c. 1, § 3.
On the ground of fraud it has also been insisted, that the case of __________ in 1 Hen. Mun. 306, shows *Page 145 
it was the opinion of the Court of Appeals in Virginia that extrinsic testimony may be received against a. grant. We have only to say that the decision does not settle the law as contended for; this point was not decided in the case alluded to; it only refers to one in which the case supposes the point of fraud had been determined, as affording a ground to impeach a grant. With that decision a majority of the Court appear to be much dissatisfied; and, so far as any thing can be collected from the case, it proves the reverse of what is contended for.
So much of the argument, on the part of the plaintiff, as respects fraud and want of consideration, involved in the fourth, fifth, sixth, seventh, eighth, ninth, and tenth objections, we shall dismiss.
The fourth and eighth objections contain other views which we. deem of sufficient consideration to merit an answer.
The fourth asserts that our grant was founded on county warrants, which could not be appropriated where they were.
It is admitted that this grant covers land within the limits assigned to John Armstrong's claims under the Act of 1783, c. 2.
The proposition on the other side is, that the warrants or entries on which Sevier's grant issued could not be granted within the limits originally assigned for John Armstrong's claims; that county warrants, which they insist ours are, could not be removed without the limits of the county in which the entries were made; but if they could, the law did not authorize their appropriation within John Armstrong's bounds. Neither of these propositions is correct.
The whole weight of this part of the argument rests on the construction of the Acts April, 1784, c. 14, § 7; October, 1784, c. 19, § 6; 1786, c. 20, § 7. These were all the acts passed by the legislature of North Carolina, respecting removals, previously to the cession. It will be recollected that North Carolina, by the Cession Act, reserved to itself the power of completing all claims to land which had originated previously to the cession of 1789; hence some of the laws passed by that *Page 146 
State, respecting the completion of these titles, are considered as obligatory; and all the land laws of that State, though passed since the cession, are referred to by our courts for the purpose of explanation. We will suppose some of the acts respecting lands passed previous to the cession may be doubtful; the opinion expressed by North Carolina in her legislative acts, on such parts of the law, has been considered good authority.
With this preliminary view, we proceed to inquire for the meaning of the legislature, as expressed in the Acts of April, 1784, c. 14, § 7; October, 1784, c. 19, § 6; 1786, c. 20, § 7. Was it its intention that county entries, when lost by better claims, might be removed, first, without the county in which the entry was made; and, granting the affirmative, whether they could be removed within John Armstrong's bounds. This part of the land law will be considered under the impression of its history, the Acts of Assembly, andusage; all of which we assert, will support the affirmative of these propositions.
North Carolina, at the commencement of the Revolution, deemed it proper to procure funds to carry on the war; she opened a land office in each county, offering her lands for sale at fifty shillings per hundred acres.[1]
In June, 1781,[2] she stopped the sale of her lands, by shutting the entry offices. In April, 1783,[3] the county offices were again opened, except within the limits designed for John Armstrong's claims, and for these the act opened an office at Hillsborough.[4] We assert that when these offices were opened by this act, viz., those of the counties and John Armstrong's, the State price was the same in them all, 10l. for every hundred acres. Our opponents assert that the price of ten pounds only applied to John Armstrong's office; more of this hereafter. We will proceed with our historical view of the subject. In April, 1784,[5] all the offices for lands in the western part of the State of North Carolina (now the State of Tennessee) were shut; and, as to these lands, never were opened again by North Carolina; after 1789, and making the cession to the United States, she had no power to do so.
At the same session,[6] when these western offices were shut, the legislature passed an act to authorize removals.[7] *Page 147 
Its words are "and in case any entry shall be made for lands, which have been previously granted or entered and located, the surveyor shall, and he is hereby authorized to survey the quantity on any vacant land in this State, which may be located and described by the person who made the entry, or any other person authorized for the purpose."
The Act of October, 1784, c. 19, § 6, provides "that if any person or persons shall have, by virtue of the law, commonly called the land law, now in force in this State, located his or their entry," c., provides in substance the same as the last act. The Act of 1786, c. 20, § 7, it is admitted on all hands, has not much agency in this argument; it declares that surveys on warrants from John Armstrong's office which had been removed should be good and legal. The only idea that can be collected from this section is that the legislature conceived it was doubtful whether the two Acts of April and October, 1784, would cover the case of removals in John Armstrong's office; and is evincive that these acts were never intended to apply to John Armstrong's office alone, as has been insisted on the other side. If so, the legislature must have known it, being but two years afterwards; and representatives who legislate are presumed to know, not only the meaning of previous acts, but the general sense of society on those acts. Had they been sensible the Acts of April and October, 1784, applied particularly to John Armstrong's claims, would they have conceived it necessary to pass the Act of 1786, particularly, to remove doubts respecting those claims?
One thing is too evident to admit of much argument, that the words of the two Acts of April and October, 1784, embrace all land claims, as well one kind as another. Some are of opinion that the first of these two acts operated in cases respecting entries thereafter to be made; the other, an extension of the principle of the first to all entries which had been previously made. Between the two acts, no rational doubt can exist that all claims are included, whether John Armstrong's, military, or county. The words are general, and why should we seek to restrict their meaning? We shall be able to show there is no reason for such restrictive interpretation.
With the counsel for the plaintiff, we admit the legislature designed to set aside a particular tract of country for the *Page 148 
satisfaction of the military claims, and pre-emption settlers, c., therein; this is described in the seventh section of the Act of 1783, c. 3, and that, agreeably to this and the eighth section, those claims and no others were to be appropriated within those limits; agreeably to the case Goodloe's Lessee v. Wilson, if laid without those limits, under the laws of North Carolina, such grants would be void. We also admit that the country south of French Broad River and Holston was set aside as Indian hunting ground, and appropriations of any kind forbidden therein.[1] But we say that the balance of the State of North Carolina (including now this State), agreeably to these two Acts of April, 1784, c. 14, § 7, and October, 1784, c. 19, § 6, was equally open to appropriation, without regard to county or John Armstrong's bounds. It is asked, why should the military tract and Indian hunting ground be excluded from general appropriation? It is replied, because the acts respecting these portions of country negatived the idea of any others entering or appropriating lands therein; these provisions have no connection with the general law, or that respecting the county and John Armstrong's office.[2]
The acts respecting the military and Indian lands had only passed about a year before the first of the two respecting removals; compensation to the officers and soldiers of the Revolution, and the rights of the Indians, were important objects to the State. Very few of the officers and soldiers had located their lands in April or October, 1784; and it was of the last consequence to the public that the Indians should be protected in their hunting grounds. If there were no negative words in the acts respecting the military and Indian lands, it is clear the legislature did not intend by its Acts of April, 1784, c. 14, § 7, and October, 1784, c. 19, § 6, to authorize individuals to appropriate lands within those tracts or portions of country by removal.
Is there any reason, that can be advanced, why any other parts of the country should be excluded from appropriation by removal or the operation of these two sections? The first expressly says, that, in case of loss by better claims, the enterers may remove to any othervacant land within the State. Our opponents say the State received a higher price for John Armstrong's lands than those entered in the counties. This is a point on which much stress has been laid; we will therefore proceed to examine it. It is clear the legislature, by the Act of 1783, c. 2, designed to include in *Page 149 
the provisions of that act county claims, as well as those in John Armstrong's office or her western lands. When the legislature designed by that act to confine a regulation to John Armstrong's office, it was so expressed, otherwise the enactments are general, of which denomination is the price of land.[1] To show this, we will examine every section of the act. Without exhausting the patience of the Court, we have only to observe that the caption is general, the preamble is equally so; the second section revives the county offices which had been shut; the language of the third section is, "that the western boundary be enlarged," c., describing this extension. The fourth, fifth, sixth, seventh, and eighth sections respect Indian lands; the ninth section is confined to John Armstrong's office. The tenth section respects the price of lands. Is it confined to John Armstrong's lands? Its words are, "every person, before he shall be entitled to enter a claim for any of the said lands;" what lands? is the question. We say any lands in the State entered in any office.[2]
Thus it already appears that the price of lands in North Carolina, not only in the county but John Armstrong's office, was £ 10 per hundred; the price of lands before that time was fifty shillings. This every man knows who entered lands in those days. Ask all our old settlers, and they will tell you this. Gentlemen on the other side tell us ours are county warrants; if so, we would ask them to tell us whether they were at fifty shillings or ten pounds; the first was the price of county lands till June, 1781, when those offices were shut, and raised to £ 10 by the Act of 1783, when the second section of the act opened them again. We have another remark to make on this part of the case, that fifty shillings in 1777 and 1778 was of more intrinsic value than £10 in certificates, c., in 1783. Certificates might then be purchased for an eighth and a tenth; it was their common price. So that the State received a better price for the lands sold previous to 1781 than after it opened its offices in 1784. Money had vastly depreciated in the course of the Revolution, and certificates so plenty as to be worth almost nothing. The idea of difference of price, so much insisted on, therefore vanishes. We find that the State, until the offices were shut in 1781, made no difference in the price of its lands; nor did it on opening the offices in 1783; the price was all the same in the counties as well as John Armstrong's office; it was raised, to be sure, from fifty shillings to ten pounds. In the session of April and May, 1784, when it authorized removals, there *Page 150 
was no entry office for western lands; all the entries that ever were made for lands in this country were then in existence, and no more were permitted. In this state of things was there any possible reason why removals should be confined to counties, or John Armstrong's bounds kept free, or excluded from the general words of the Acts of April, 1784, c. 14, § 7; October, 1784, c. 19, § 6?
Claimants in Armstrong's office were on an equal footing with those in the country; when their money was paid they made entries, and thus had an opportunity of making at once a choice. If lost by better claims, they should be on the same footing as to removals; that is, anywhere in the State where they could find vacant land, except within the military and Indian lands.
In dismissing this inquiry into the meaning of the Act of 1783, c. 2, we have only to observe that the Court will perceive that the ninth, fourteenth, and twenty-fourth sections of the act are confined to J. Armstrong's claims; the balance of the act is general.[1] Why should boundary make any difference? No reason can be seen why John Armstrong's bounds should be exempted from removals; the price, we have seen, was the same in all parts of the State. If any doubt could remain on this point, the Act of North Carolina, 1790, c. 14, caption and section 2, places it out of dispute. This act expressly refers to and repeals part of the Act of 1783, c. 2, reducing the price of lands from £10 to 30s.; at this time North Carolina had not a foot of land in the limits which were assigned to John Armstrong's office.
That part of the plaintiff's argument respecting removals which confines them to the limits of the county in which the entries were made is refuted by the opinion of the legislature of North Carolina, as expressed in its Act of 1794, c. 17, § 3; this section enacts that, in future, warrants shall not be removed out of the county. The act had no obligatory force here, having been made since the cession, but it is a legislative construction of the Acts of April, 1784, c. 14, § 6; October, 1784, c. 19, § 7, the force and obligation of which are common to both States.
In this construction of the acts respecting removals, we are further opposed by the plaintiff's counsel calling to their aid the doctrine of refunding purchase-money in case of loss by better claims. The Acts of November, 1777, c. 1, § 6; *Page 151 
April, 1778, c. 3, §§ 2, 5, are referred to. The principle of these acts is contained in the second section of the Act of 1778; it provides that, if on survey it shall appear that part of the entry be lost by an older or better claim, the entry taker shall refund in proportion to the part lost.
We are told that this is the only provision for county claims, and that removals were intended solely for John Armstrong's claims; we have already at length examined this point; some other and further views will be taken of it. The Acts of April, 1784, c. 14, § 7; October, 1784, c. 19, § 6, in this respect are cumulative.[1]
This idea is confirmed by a legislative opinion of North Carolina, 1794, c. 17, § 3. The proviso to the fifth section of the Act of North Carolina, 1791, c. 21, is in further confirmation of this idea. That act provides a method by which entry takers should proceed in refunding money, where part of tracts has been lost agreeably to the principle laid down in the Act of April, 1778, c. 3, § 2. The proviso excludes the ceded territory (this country) from the operation of the act. Not only from the fact of North Carolina having parted with all interest in the lands of this country, 1789, c. 3, but from this proviso, we must be convinced that that State would never agree to refund money for lands lost by better claims here. Nor has it ever been contended that entries from that State could be removed to this since the cession; and vice versa.
Should any doubt remain that the power of removal given by the Act of 1784 is merely cumulative, the opinion of the legislature of North Carolina thereon, as expressed in the Act of 1793, c. 23, § 5, is decisive. These are the express words "that it shall not be lawful for any person making an entry of land to withdraw the same, but all entrance moneys shall be paid by the respective entry takers into the public treasury, and, in case of deficiencies when the lands entered shall be surveyed, the persons entering may avail themselves of the mode of relief already pointed out by law;" that is, by removal.
The Cession Act of North Carolina,[2] second edition, has been relied upon. It is asserted that, admitting the Acts of April and October, 1784, authorize removals, the Cession Act repeals them. We admit, that, so far as any of the *Page 152 
provisions of the Cession Act are contrary to those of prior date, those acts are repealed; but, we insist there is nothing in the Cession Act that countenances the idea contended for on the other side. This act, after providing for the removal of military and John Armstrong's claims, particularly has this clause: —
"And where entries have been made agreeably to law and titles under them not perfected by grant or otherwise, then, and in that case the governor for the time being, shall, and he is hereby required to, perfect from time to time such titles, in such manner as if this act had never been passed; and that all entries made by, or grants made to, all and every person and persons whatsover, agreeably to law, and within the limits hereby intended to be ceded to the United States, shall have the same force and effect as if such cession had not been made."
The eighth condition of the same act provides that the laws of North Carolina shall continue in force.
Before the cession, the titles might be perfected by removal; so it remained afterwards; no alteration was made by the Cession Act in this respect.
In concluding this argument we have to observe that, if doubts existed respecting these statutes, usage is on our side. On the eastern side of Cumberland Mountain, in this State, there are few other grants, except such as are founded on removed county warrants. There is scarcely a claim in Grainger, Claiborne, Campbell, Anderson, Roane, Knox, Blount, Sevier, Cock, and Jefferson counties but is founded on these removed county warrants; with safety we can affirm two-thirds in those counties are of that kind. In North Carolina, claims of this nature are innumerable; shall they at this day be overturned?
In addition to the reasons we have offered to the Court, it must not be forgotten, that the same question respecting removals has been decided by the State courts more than once. In the case of Dotson and Cocke, in the Superior Court of Hamilton District, this question occurred, and, on the principles we contend for, received the same determination.[1]
The tenth objection refutes itself. The date of the letter from Sevier to the secretary of North Carolina is subsequent to the date of the grant, and its contents relate to other matters.
 OPINION OF THE COURT. *Page 153 
Viewing the manner in which the consideration is usually expressed in grants, we are of opinion that the consideration of ten pounds is sufficiently intelligible. There are usually but three kinds of considerations, — fifty shillings, ten pounds, and military. It will not admit of being construed as founded on the first and last of these claims; it must of necessity be the second; on this ground the grant cannot be rejected.
We are of opinion that the plat annexed to the grant is not an essential part of it; if recurred to, it must be for the purpose of explanation, and not to destroy its validity. So it is in relation to the cases read by the plaintiff's counsel; they relate to papers referred to in a deed or instrument of writing. In considering the papers thus referred to as part of the instrument, the Court goes on the idea of supporting the existence of the deed. Here we are asked to permit parol and extrinsic testimony with a view of destroying the existence of a grant. This, consistently with the principles of law, cannot be done. Once for all, we wish to be understood that no kind of evidence can be received to impeach the validity of a State grant, except an entry. And per Todd: If this point were resintegra, I should be strongly inclined to think an entry could not be received in evidence in ejectment, under the Acts of 1796, c. 20, and 1787, c. 23. By the Court: The general principle of law is, that evidence dehors cannot be received to impeach the validity of a grant. The exceptions to this rule are collected in 1 Fonb. 122, c. 2, § 8, in notes. The ground of these exceptions arise from acts which are contra bonos mores, malum in se, or malumprohibitum.
None of the objections taken by the plaintiff fall within the exceptions; the general rule of law must apply. It was understood that the practice of admitting an entry in evidence in ejectment originated in the construction of the Acts of 1786 and 1787.[1] This principle having obtained in practice, the Court was not inclined to disturb it, whatever ideas might be entertained respecting the true *Page 154 
construction of those acts. In questions arising under the land laws, the Court was informed that it was the only exception to the general rule of law which had obtained in the State courts. No such principle had been established in any State where there were courts of equity, and we think no other exception should prevail. In the procurement of land titles, the law requires many things to be done by its officers which are directory. To impeach the validity of grants on the ground of non-compliances with these parts of the law would be attended with great public inconvenience.[2] The State has intrusted certain officers of government, and the law presumes, as it respects points of regularity, that what they have done was authorized and correct, as the acts of surveyors, chain carriers, markers, c. We take a distinction between an entire want of authority in the officers issuing a grant, and whether it were regularly done. Where limits are assigned for the appropriation of particular species of claims, as the military lands, and other kinds of claims are granted, such grants aremerely void, as in the case referred to at the bar.[3] There would be an entire lack of authority to grant such lands. So of the lands set apart for the use of the Indians. It would be of very mischievous consequence to society if the propriety of issuing grants could be inquired into on the ground of irregularity. There is a sound distinction in law between acts which are absolutely void, and such as are only voidable. On general principles, grants are not void on the ground of fraud or irregularity in obtaining them, butvoidable by those who are injured.
The English authorities show there are two kinds of grants. One made on the suggestion or surmise of the person applying for a grant: in this case the suggestions are stated by way of recital; the other kind, made on the king's own knowledge, and contains his affirmation simply. The grant objected to is of the latter kind, which cannot be defeated by any extrinsic testimony. The Court cannot inquire whether the consideration were paid or not, the deputy surveyor duly authorized, or whether the lines of the tract be too long.
The statutes of North Carolina, relative to the appropriation of lands, must be construed pari materia. Defects and doubtful points arising out of one act may be supplied and explained by clauses in the same or other acts. The Act of 1783, c. 2, seems to have been correctly considered by *Page 155 
the defendant's counsel. In general, this act is not insulated in its provisions; it revives and amends the laws respecting county offices; in addition opens John Armstrong's for the sale of the western lands at the same price paid for lands in the county offices. We cannot perceive that the ninth section of the Act of November, 1777, c. 1, affects the case any way.
The Court deems it unimportant to inquire whether the two Acts of April and October, 1784, respecting removals, be intended in the one case to operate in future, and the other in the past tense. These clauses are general in their operation, and not confined to any species of land claims. Taking the whole of the land laws of North Carolina into view, it appears to have been the intention of the legislature that claimants should get other vacant land in lieu of what might be taken by better claims, or that they should receive a pecuniary compensation for the part lost Nor does it appear to us that the Acts of April, 1784, c. 14, § 7; October, 1784, c. 19, § 7, repealed the Act of April, 1778, c. 3, § 2, which directed the entry takers to refund in case of loss; the latter acts were cumulative. If the usual rules of construction left this point doubtful, the Act of North Carolina 1793, c. 23, § 5, would remove every difficulty on this ground.
What would be the situation of things if removals were not permitted? Enterers of lands in the counties of Washington, Sullivan, and Greene would be without remedy. The proviso to the fifth section of the act of North Carolina[1] expressly says that moneys shall not be refunded (agreeably to the Act of April, 1778, c. 3, § 2) for lost lands in the ceded territory, now the State of Tennessee. Beside, the act of North Carolina,[2] puts an end to refunding in case of loss, and leaves in force the remedy by removal alone.
A court of equity is the proper tribunal for avoiding a grant; there the parties are apprised by the pleadings of the nature of the complaint and defence, and come prepared to the contest. In ejectment, legal title and boundary only come in question. The case of _________ in 1 Hen. Mun. 307, is a solitary case, without authority. Nor did the judges of the Court of Appeals in Virginia, in reviewing this case, appear to be satisfied with it. The case *Page 156 
then before the Court did not make it necessary to give a decisive opinion on it; but, considering what dropped from the Court incidentally, it is plainly to be inferred that a majority of the judges did not think it was law. In North Carolina, it appears the courts will not receive extrinsic testimony to impeach a grant.
This practice is founded on the general principle of law, and we are not inclined to go any further than the practice of the State in furnishing exceptions to this general rule.
Contemporaneous expositions of the land laws are certainly most to be relied on. In the course of the argument, we wished to be satisfied whether county warrants could be appropriated within John Armstrong's limits, we are satisfied on this ground that they can, not only from considering the whole of the land laws together, but the usage and practice of North Carolina in granting lands is corroborative of this idea.
It is objected the State of North Carolina could not issue a grant for more than 5000 acres, and the third section of the Act of November, 1777, c. 1, and 1783, c. 2, § 9, have been referred to in support of this objection. These statutes are directory, as to the quantities to be entered. The Act of April, 1784, c. 19, § 3 is a general law, and not confined to swamp lands; its language is general, and we see no reason why a restrictive interpretation should take place. After removal and consolidation of entries, the third section does not limit the quantity to be surveyed in one entire tract. The act being posterior in date to those directing the quantities to be entered in the respective offices, and taking into view the practical interpretation of this section by the State of North Carolina, we are of opinion the grant is not void on this ground. And per
M'NAIRY, J.: Independent of this act, he should be inclined to think the grant would not be void. The Acts of April and October, 1784, which authorize removals, contain no negative words respecting consolidation; if a man has purchased several entries which would have been lost by better claims, and is under a necessity of removing, no reason can be seen why he may not survey such removed claims adjoining each other; the law does not forbid this; different grants may issue to the same person for the lands thus adjoining; the effect is the same as if only one grant had issued; for, if the same man can appropriate to himself a body of adjacent land by different entries and different grants, it amounts to the same *Page 157 
thing in substance as if but one grant had issued; the land appropriated by the same individual is precisely the same, whether conveyed by one or many grants. At best it can only be matter of form, and for this to avoid a grant would be absurd.
2* A removed warrant from any of the land offices, except the military, is one that is surveyed off the land located or entered, in consequence of the entry being lost or taken away by a better claim. In making a survey on a removed warrant, in these offices, a second entry or location is not necessary to authorize the survey. A grant was the first act of the claimant on record relative to such appropriations.
[1] 1 Com. Dig. Let. Attorney, 13.
[1] April, 1763, c. 2, § 10.
[1] Nov., 1777, c. 1, § 4.
[1] H. B. 254; 2 H. B. 557; 6 Term Rep. 710, 737; 8 Term Rep. 483; 2 Term Rep. 641; 6 Mod. 237; 2 Wash. 133; 5 Com. Dig., Pleader, 12; Atk. 550; P. Ev. 3; Co. Lit. 96; Plow. 130, 136.
[2] 2 Term Rep. 749; 7 Term Rep. 311, 314; 9 Co. 467; 2 Term Rep. 474; 6 Co. 15; 1 Burr. 395; 4 Co. 70; 3 Co. 77, 78; 6 Co. 15; 1 Co. 4; Salk. 500; 7 Vin. Ab.
[1] 2 Com Dig. tit. Chancery, 3.
[1] Pang v. Price, 1 Wils. 52.
[2] Tenn. Laws, 1807, c. 2, § 44.
[3] 1 Burr, 595; 9 Co. 42; 6 Co. 15; 4 Co. 71; 10 Co. 109; 1 Co. 26; 1 Leo. 30; 17 Vin. Ab. 104, 114, pl. 2; ib. 106; 6 Mod. 226;. Rob. F, Con. 502; 5 Com. Dig. 281; Rose's Ev.; Peake Ev. 113; 1 Fonb. 112 n.
[4] 3 Term Rep. 474; 2 Wils. 347; 2 W. Bl 1109; 3 Burr. 1568; 4 Burr. 2230; 1 Fonb. 60, 61, in n.; Str. 741; 1 P.W. 240, 727; Peake Ev. 79; 8 Term Rep. 147.
[1] See 1 Hay. 107.
[2] 4 American Law Journal, 1.
[1] 1 Wils. 332; 1 Fonb. 132, 268; 2 Pow. Cont. 176; 2 Ver. 475, 476; 1 P. W. 75; 1 Wash. 17; 4 Term Rep. 32, 60.
[1] 2 Hay. 98.
[2] Nov., 1777, c. 1, § 14.
[1] Nov., 1777, c. 1, § 10.
[1] 1777, c. 1, § 4.
[1] 2 Cra. 69.
[2] Vaug. 160; 3 Atk. 577; 6 Term Rep. 392; Jenk. Cent. 162, 169; 2 Mass. 177; Evan's Poth. 2 vol. 10, 17, p. 10; Camp. 22.
[3] Hardin, 568; 1 Caines' C. E. 1-7.
[4] 1715, c. 38, § 5.
[5] 2 Call. 125; Com. Dig. Bargain and Sale, B. 11.
[6] 2 Johns. 254.
[7] Wils. 78.
[8] 2 Atk. 150.
[1] Littell, 44; 2 Caines' C.E. 181; 1 Hay. 22, 238, 239, 254, 237, 258, 377.
[1] Tenn. L. 1806, c. 1, § 51.
[2] Vincent's Lessee v. Conrad, 4 Am. L. J.
[3] 17 Vin. Ab. 100; Ov. pl. 1, and n. 151, Mem. N.
[4] 17 Vin. Ab. 109; v. 8, p. 22; Stat. 6 H. VI. c. 15.
[5] 17 Vin. Ab. 109, pl. 8.
[1] 17 Vin. Ab. 151; Me. pl. 1 and n. p. 8; 9 pl. 138, E. C. 3.
[2] 17 Vin. Ab. 80.
[3] 17 Vin. Ab. 117; Maryl. 310.
[4] 17 Vin. Ab. 138, 139; 2 Bl. Com. 357, 358; 17 Vin. Ab. 104, 105; 2 Maryl. 187, 190, 310, 311.
[5] Wash. 114, 115; Sch. Lef. 67-70; 1 Pow. C. 532; Maryl. 67, 161, 187; 1 Hay. 356.
[6] Hayw. 359; 2 Day, 45; 2 Johns. 84, 221; 3 Johns. 422; 4 Johns. 163; Maryl. 67, 162, 187, 190, 308, 309, 555; Term Rep. 474; Rob. Frauds, 1-90 119, 120; 2 P. W. 203; 2 Bl. 1249; 1 Johns. 139; 2 Call, 310; 2 Pow. C. 7; Peake EV. 112; 1 Caines, 493; 2 Johns. 37; 1 Hayw. 107, 378, n.; Hardin, 307; 8 Term Rep. 379; 5 East, 138, 139; Bl. 1250; 2 Wash. 201; 2 Johns. 603; 1 Johns. 571; 2 Hen. Mun. 621; 2 Dall. 171; 1 Dall. 19, 193, 426; 1 Hen. Mun. 306.
[1] Wils. 78; 17 Vin. Ab. 151; 5 Rep. 6; 3 Rep. 56, 167; 10 Rep. 56, 67; 11 Rep. 116; 5 Mod. 301; 8 Rep. 111, 112.
[2] Hardin, 464.
[3] 1 Ves. 424.
[1] 1777, c. 1, §§ 1, 2.
[2] §§ 1, 3, 4.
[3] § 5.
[4] §§ 5-7.
[5] §§ 10-16, 18, 19.
[6] § 14.
[7] 1783, c. 2, § 13; 1793, c. 23, § 1.
[1] 1777, c. 1, § 14; April, 1778, c. 3, § 6.
[2] Fletcher v. Peck, S. C. U. S.
[3] 1795, c. 17, §§ 1, 3.
[4] 1796, c. 7, § 7; 1800, c. 7; 1801, c. 2, § 3; 1802, c. 9; 1803, c. 14.
[5] c. 17.
[1] April, 1779, c. 6, §§ 2-4; 1783, c. 2, §§ 20, 21; April, 1778, c. 3, § 4.
[2] It would seem that even this care would not enable a court of law to say a grant should be void; and it is believed a court of equity in this country would pass it over, and act as if three months had been allowed to caveat.
[1] 2 Ves. 554.
[2] 1786, c. 20; 1787, c. 23; 1796, cc. 7, 9.
[3] Vincent's Lessee v. Conrad, 4 Am. L. J.
[4] 1 Hay. 259.
[1] Nov., 1777, c. 1.
[2] c. 7, § 7.
[3] c. 2.
[4] § 14.
[5] c. 12, § 3.
[6] April, 1784.
[7] c. 4, § 7.
[1] April, 1778, c. 3, § 5; 1783, c. 2, § 5.
[2] 1783, c. 3, §§ 2, 3.
[1] § 10.
[2] See Caption §§ 1, 2, and first part of § 3.
[1] See § 22.
[1] Camp. 214; 2 Hay. 227, 228; 2 Cr. 389.
[2] 1789, c. 3, § 1.
[1] Tenn. 169, 323.
[1] The decision at Jonesborough in the year 1798, Russell's Rep.v. Blair, was founded on the ninth section of the Act of 1777, c. 1. The decision, however was strenuously arraigned, which produced an abandonment of the ground on which it took place, and that furnished by the Acts of 1786 and 1787 taken in its stead. See Tenn. 419.
[2] See 1 Burr. 447.
[3] Hughes, 39, 203.
[1] 1791, c. 21.
[2] 1793, c. 2.
The Cession Act leaves things, as to perfecting land titles precisely as they were before its passage.
In doubtful cases, usage may be safely recurred to, in order to ascertain the meaning of the legislature; of such force and importance has this principle been considered that the Supreme Court of the United States in a case which came up from the State of Pennsylvania adhered to practice or precedent though contrary to their understanding of the law.